Barry I. Levy (BL 2190)
Michael A. Sirignano (MS 5263)
Joshua D. Smith (JS 3989)
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000
*Counsel for Plaintiffs Government Employees Insurance Co.,*
*GEICO Indemnity Co, GEICO General Insurance Company*
*and GEICO Casualty Co.*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
GOVERNMENT EMPLOYEES INSURANCE CO.,
GEICO INDEMNITY CO., GEICO GENERAL INSURANCE
COMPANY and GEICO CASUALTY CO.,                                    Docket No.:_____ (   )

Plaintiffs,

        -against-                                                        **Plaintiff Demands a Trial by**
                                                              **Jury**

GIULIO CARUSO, D.C., GC CHIROPRACTIC P.C.,
INTEGRATED CHIROPRACTIC OF NY P.C., FULL SPINE
CHIROPRACTIC OF NY P.C., BROOK CHIROPRACTIC OF
NY P.C., COMPASS CHIROPRACTIC OF NY P.C., FELIX
KOGAN, and JOHN DOE DEFENDANTS 1-5.

          Defendants.
------------------------------------------------------------------------X

## COMPLAINT

Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General

Insurance Company and GEICO Casualty Co. (collectively "GEICO" or "Plaintiffs"), as and for

their Complaint against the Defendants, hereby allege as follows:

## NATURE OF THE ACTION

1.      This action seeks to recover more than $1,460,000.00 that the Defendants

wrongfully obtained from GEICO by submitting, and causing to be submitted, thousands of

fraudulent no-fault insurance charges relating to medically unnecessary, illusory, and otherwise

non-reimbursable healthcare services, including chiropractic examinations, chiropractic manipulation, computerized range of motion and muscle strength testing, physical performance testing, chiropractic manipulation under anesthesia, and electrodiagnostic testing (collectively the "Fraudulent Services"), that allegedly were provided to New York automobile accident victims ("Insureds").

2.      The Fraudulent Services were provided, to the extent that they were provided at all, pursuant to the dictates of unlicensed non-physicians that illegally owned and control multiple medical clinics in the New York metropolitan area, as well as the purported healthcare practices operating therefrom, including Defendants GC Chiropractic P.C. ("GC Chiro"), Integrated Chiropractic of NY P.C. ("Integrated Chiro"), Full Spine Chiropractic of NY P.C. ("Full Spine Chiro"), Brook Chiropractic of NY P.C. ("Brook Chiro"), and Compass Chiropractic of NY P.C. ("Compass Chiro") (collectively the "PC Defendants").

3.      In addition, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of more than $2,100,000.00 in pending no-fault insurance claims that have been submitted by or on behalf of Defendants GC Chiro, Integrated Chiro, Full Spine Chiro, Brook Chiro, and Compass Chiro because:

(i)      the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(ii)     in many cases, the Fraudulent Services never were provided in the first instance;

(iii)    the billing codes used for the Fraudulent Services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO;

(iv)    GC Chiro, Integrated Chiro, Full Spine Chiro, Brook Chiro, and Compass Chiro were fraudulently and unlawfully incorporated, owned, and/or controlled by unlicensed individuals and entities, unlawfully split fees with unlicensed

individuals and entities, and, therefore, were ineligible to bill for or to collect no-fault benefits;

(v)     in many cases, the Fraudulent Services billed through GC Chiro, Integrated Chiro, Full Spine Chiro, Brook Chiro, and Compass Chiro were provided pursuant to illegal kickback arrangements between the Defendants and the owners and controllers of purported multi-disciplinary healthcare clinics (the "Clinics") throughout the New York metropolitan area where GC Chiro, Integrated Chiro, Full Spine Chiro, Brook Chiro, and Compass Chiro purported to provide the Fraudulent Services.

(vi)    the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal self-referral arrangements amongst the Defendants and others;

(vii)   in many cases, the Fraudulent Services – to the extent that they were provided at all – were provided by independent contractors, rather than by employees of GC Chiro, Integrated Chiro, Full Spine Chiro, Brook Chiro, and Compass Chiro, and therefore were non-reimbursable.

The Defendants fall into the following categories:

(i)     GC Chiro, Integrated Chiro, Full Spine Chiro, Brook Chiro, and Compass Chiro are fraudulently incorporated, owned, and/or controlled professional corporations through which the Fraudulent Services purportedly were performed and billed to insurance companies, including GEICO.

(ii)    Defendant Giulio Caruso, D.C. ("Caruso") is a licensed chiropractor that falsely purported to own and control the PC Defendants and purported to perform many of the Fraudulent Services.

(iii)   Defendant Felix Kogan ("Kogan"), and John Doe Defendants 1-5 (collectively the "Management Defendants") are not and never have been licensed healthcare professionals, yet nonetheless secretly and unlawfully owned, controlled, and derived economic benefit from the PC Defendants' healthcare practices, in contravention of New York law.

3.      As discussed below, Defendants at all relevant times have known that:

(viii)  the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(ix)    in many cases, the Fraudulent Services never were provided in the first instance;

(x)   the billing codes used for the Fraudulent Services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO;

(xi)   GC Chiro, Integrated Chiro, Full Spine Chiro, Brook Chiro, and Compass Chiro were fraudulently and unlawfully incorporated, owned, and/or controlled by unlicensed individuals and entities, unlawfully split fees with unlicensed individuals and entities, and, therefore, were ineligible to bill for or to collect no-fault benefits;

(xii)   in many cases, the Fraudulent Services billed through GC Chiro, Integrated Chiro, Full Spine Chiro, Brook Chiro, and Compass Chiro were provided pursuant to illegal kickback arrangements between the Defendants and the owners and controllers of purported multi-disciplinary healthcare clinics (the "Clinics") throughout the New York metropolitan area where GC Chiro, Integrated Chiro, Full Spine Chiro, Brook Chiro, and Compass Chiro purported to provide the Fraudulent Services.

(xiii)   the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal self-referral arrangements amongst the Defendants and others;

(xiv)   in many cases, the Fraudulent Services – to the extent that they were provided at all – were provided by independent contractors, rather than by employees of GC Chiro, Integrated Chiro, Full Spine Chiro, Brook Chiro, and Compass Chiro, and therefore were non-reimbursable.

4.   As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that have been billed to GEICO through the PC Defendants.

5.   The charts annexed hereto as Exhibits "1" – "5" set forth a representative sample of the fraudulent claims that have been identified to-date that the Defendants have submitted, or caused to be submitted, to GEICO.

6.   The Defendants' fraudulent scheme began as early as 2015 and has continued uninterrupted through the present day.

7.   As a result of the Defendants' scheme, GEICO has incurred damages of more than $1,460,000.00.

## THE PARTIES

**I.     Plaintiffs**

8.      Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. are Maryland corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

**II.    Defendants**

9.      Defendant Caruso resides in and is a citizen of New Jersey. Caruso was licensed to practice chiropractic in New York on October 19, 1992 and in New Jersey on September 7, 1994, purported to own the PC Defendants, and purported to perform many of the Fraudulent Services on behalf of the PC Defendants.

10.     Defendant GC Chiro is a New York chiropractic professional corporation with its principal place of business in New York. GC Chiro was incorporated in New York on or about April 30, 2014, purported to be owned by Caruso, and was used as a vehicle to submit fraudulent billing to GEICO and other insurers.

11.     Defendant Integrated Chiro is a New York chiropractic professional corporation with its principal place of business in New York. Integrated Chiro was incorporated in New York on or about June 14, 2017, purported to be owned by Caruso, and was used as a vehicle to submit fraudulent billing to GEICO and other insurers.

12.     Defendant Full Spine Chiro is a New York chiropractic professional corporation with its principal place of business in New York. Full Spine Chiro was incorporated in New York on or about December 1, 2014, purported to be owned by Caruso, and was used as a vehicle to submit fraudulent billing to GEICO and other insurers.

13.     Defendant Brook Chiro is a New York chiropractic professional corporation with its principal place of business in New York. Brook Chiro was incorporated in New York on or about December 9, 2016, purported to be owned by Caruso, and was used as a vehicle to submit fraudulent billing to GEICO and other insurers.

14.     Defendant Compass Chiro is a New York chiropractic professional corporation with its principal place of business in New York. Compass Chiro was incorporated in New York on or about March 11, 2019, purported to be owned by Caruso, and was used as a vehicle to submit fraudulent billing to GEICO and other insurers.

15.     Defendant Kogan resides in and is a citizen of New York. Kogan has never been a licensed healthcare professional, yet has owned, controlled, and derived economic benefit from the PC Defendants in contravention of New York law.

Upon information and belief, John Doe Defendants 1-5 reside in and are citizens of New York. John Doe Defendants 1-5 are individuals and entities, presently not identifiable, who are not and never have been licensed healthcare professionals, yet – together with Kogan – have owned, controlled, and derived economic benefit from the PC Defendants in contravention of New York law, engaged in illegal kickback, fee splitting and referral relationships as part of the fraudulent scheme, and directed the PC Defendants' predetermined treatment and billing protocols, without regard for genuine patient care.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

17.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States.

18.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

19.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

20.     For example, and as set forth herein, Defendants submitted or caused to be submitted a substantial amount of fraudulent billing to GEICO under New York automobile insurance policies, for treatment that they purported to provide to GEICO's New York-based Insureds. In reliance on the fraudulent claims, personnel at a GEICO office in the Eastern District of New York issued payment on the fraudulent claims.

## ALLEGATIONS COMMON TO ALL CLAIMS

21.     GEICO underwrites automobile insurance in New York and New Jersey.

## I.     An Overview of the Pertinent Law Governing No-Fault Insurance Reimbursement

## A.     Pertinent New York Law Governing No-Fault Insurance Reimbursement

22.     New York's no-fault insurance laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the health care services that they need.

23.     Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R.

§§ 65, et seq.), automobile insurers are required to provide no-fault insurance ("Personal Injury Protection" or "PIP") benefits ("PIP Benefits") to Insureds.

24.     In New York, PIP Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for healthcare goods and services, including chiropractic services.

25.     In New York, an Insured can assign his/her right to PIP Benefits to health care goods and services providers in exchange for those services.

26.     In New York, pursuant to a duly executed assignment, a health care provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").

27.     In the alternative, in New York a healthcare services provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form").

28.     Pursuant to the New York no-fault insurance laws, healthcare services providers are not eligible to bill for or to collect PIP Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

29.     For instance, the implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York or meet any applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

(Emphasis added).

30.    New York law prohibits licensed healthcare services providers, including chiropractors and physicians, from paying or accepting kickbacks in exchange for patient referrals. See, e.g., New York Education Law §§ 6509-a; 6531.

31.    New York law prohibits licensed healthcare services providers, including chiropractors and physicians, from referring patients to healthcare practices in which they have an ownership or investment interest unless: (i) the ownership or investment interest is disclosed to the patient; and (ii) the disclosure informs the patient of his or her "right to utilize a specifically identified alternative health care provider if any such alternative is reasonably available". See New York Public Health Law § 238-d.

32.    What is more, with limited exceptions that are not applicable here, New York law prohibits licensed healthcare services providers, including chiropractors and physicians, from referring patients for electrodiagnostic testing to healthcare practices in which they have an ownership interest, whether or not the healthcare services providers disclose their ownership interest to the patient. See New York Public Health Law § 238-a.

33.    Therefore, under the New York no-fault insurance laws, a healthcare services provider is not eligible to receive PIP Benefits if it is fraudulently licensed, if it pays or receives unlawful kickbacks in exchange for patient referrals, or if it engages in illegal self-referrals.

34.    In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that healthcare services providers that fail to comply with licensing requirements are ineligible to collect PIP Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

35.    In Andrew Carothers, M.D., P.C. v. Progressive Ins. Co., 2019 N.Y. Slip Op. 04643 (June 11, 2019) the New York Court of Appeals reiterated that only licensed physicians may

practice medicine in New York because of the concern that unlicensed physicians are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient."

36.     Pursuant to the New York no-fault insurance laws, only healthcare services providers in possession of a <u>direct</u> assignment of benefits are entitled to bill for and collect PIP Benefits. There is both a statutory and regulatory prohibition against payment of PIP Benefits to anyone other than the patient or his/her healthcare services provider. The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss … directly to the applicant or ... upon assignment by the applicant ... shall pay benefits <u>directly</u> to providers of healthcare services as covered under section five thousand one hundred two (a)(1) of the Insurance Law …

37.     Accordingly, for a healthcare services provider to be eligible to bill for and to collect charges from an insurer for healthcare services pursuant to New York Insurance Law § 5102(a), it must be the <u>actual</u> provider of the services. Under the New York no-fault insurance laws, a healthcare services provider is not eligible to bill for services, or to collect for those services from an insurer, where the services were rendered by persons who were not employees of the healthcare services provider, such as independent contractors.

38.     In New York, claims for PIP Benefits are governed by the New York Workers' Compensation Fee Schedule (the "NY Fee Schedule")

39.     When a healthcare services provider submits a claim for PIP Benefits using the current procedural terminology ("CPT") codes set forth in the NY Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable laws and regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the

service and the attendant fee were not excessive.

40. Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 forms submitted by a healthcare services provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

41. Pursuant to the New York no-fault insurance laws, for services provided prior to January 23, 2018, the maximum permissible charge for treatment received outside of New York State, e.g., New Jersey, is the prevailing fee in the geographic location of the provider.

42. Pursuant to the New York no-fault insurance laws, for services provided on or after January 23, 2018, the maximum permissible charge for treatment received outside of New York State, e.g., New Jersey, is the lowest of: (i) the amount of the fee in the region in New York State that has the highest applicable amount in the fee schedule for that service; (ii) the amount charged by the provider; and (iii) the prevailing fee in the geographic location of the provider.

**B. Pertinent New Jersey Law Governing No-Fault Insurance Reimbursement**

43. Like New York, New Jersey has a comprehensive statutory system designed to ensure that motor vehicle accident victims are compensated for their injuries. The statutory system is embodied within the Compulsory Insurance Law (N.J.S.A. 39:6B-1 to 3) and the Automobile Reparation Reform Act (N.J.S.A. 39:6A-1 et seq.), which require automobile insurers to provide PIP Benefits to Insureds.

44. As in New York, under the New Jersey no-fault insurance laws, an Insured can assign his or her right to PIP Benefits to healthcare services providers in exchange for those services. Pursuant to a duly executed assignment, a healthcare services provider may submit

claims directly to an insurance company in order to receive payment for medically necessary services, using the required claim forms, including the HCFA-1500 form.

45.     In order for a healthcare services provider to be eligible to receive PIP Benefits in New Jersey, it must comply with all relevant laws and regulations governing healthcare practice in New Jersey.

46.     Thus, a healthcare services provider in New Jersey is not entitled to receive PIP Benefits where it has failed to comply with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey, whether or not the underlying services were medically necessary. See, e.g., Liberty Mut. Ins. Co. v. Healthcare Integrated Servs., 2009 N.J. Super. Unpub. LEXIS 2416 at * 4 - * 5 (N.J. App. Div. 2009)("This court has held that a provider of such services is not entitled to reimbursement for services covered by PIP unless the provider and the services are in compliance with relevant laws and regulations."); Varano, Damian & Finkel, L.L.C. v. Allstate Ins. Co., 366 N.J. Super. 1, 6 (N.J. App. Div. 2004)(healthcare services provider operated in violation of pertinent regulatory standards "is not eligible to receive PIP benefits."); Allstate Ins. Co. v. Orthopedic Evaluations, Inc., 300 N.J. Super. 510, 515-519 (N.J. App. Div. 1997)(healthcare services provider's lack of compliance with pertinent regulatory standards rendered it ineligible to collect PIP Benefits, whether or not the underlying services were medically necessary); Allstate Ins. Co. v. Greenberg, 376 N.J. Super. 623, 632 (N.J. Law Div. 2004)("A medical services provider's failure to comply with the standards promulgated by the Board of Medical Examiners make it ineligible to receive PIP reimbursement."); Allstate Ins. Co. v. Schick, 328 N.J. Super. 611, 620 (N.J. 1999)("[A]n insurer may properly deny PIP benefits under the No Fault Law based upon a healthcare services

provider's failure to comply with the administrative regulations governing the practice of healthcare in this State.")

47.     Moreover, in order for a specific healthcare service to be eligible for PIP reimbursement in New Jersey, the service itself must be provided in compliance with all relevant laws and regulations governing healthcare practice in New Jersey. See, e.g., Healthcare Integrated Servs., supra; Orthopedic Evaluations, Inc., supra.

48.     By extension, insurers such as GEICO are not obligated to make any payments of PIP Benefits to healthcare services providers in New Jersey that are not in compliance with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey.

49.     Furthermore, insurers such as GEICO are not obligated to make any payments of PIP Benefits in New Jersey for healthcare services that are not rendered in compliance with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey.

50.     Pursuant to N.J.A.C. 13:44-E-2.6, chiropractors in New Jersey are prohibited from paying or receiving kickbacks, either directly or indirectly, in exchange for patient referrals.

51.     Therefore, chiropractors and chiropractic practices in New Jersey that pay kickbacks in exchange for patient referrals are not eligible to receive PIP Benefits.

52.     In New Jersey, chiropractors generally may not refer patients to a healthcare practice in which they have a significant beneficial interest. Specifically, N.J.S.A. 45:9-22.5 (the "Codey Law") provides that:

> A practitioner shall not refer a patient or direct an employee of the practitioner to refer a patient to a health care service in which the practitioner, or the practitioner's immediate family, or the practitioner in combination with the practitioner's immediate family has a significant beneficial interest . . . .

53.     Pursuant to N.J.S.A. 45:9-22.4:

"Health care service" means a business entity which provides on an inpatient or outpatient basis: testing for or diagnosis or treatment of human disease or dysfunction; or dispensing of drugs or medical devices for the treatment of human disease or dysfunction. Health care service includes, but is not limited to, a bioanalytical laboratory, pharmacy, home health care agency, rehabilitation facility, nursing home, hospital, or a facility which provides radiological or other diagnostic imagery services, physical therapy, ambulatory surgery, or ophthalmic services.

"Practitioner" means a physician, chiropractor or podiatrist licensed pursuant to Title 45 of the Revised Statutes.

"Significant beneficial interest" means any financial interest; but does not include ownership of a building wherein the space is leased to a person at the prevailing rate under a straight lease agreement, or any interest held in publicly traded securities.

54.    Pursuant to N.J.S.A. 45:9-22-5(c)(1), the Codey Law's restrictions on patient referrals do not apply to:

medical treatment or a procedure that is provided at the practitioner's medical office and for which a bill is issued directly in the name of the practitioner or the practitioner's medical office … .

55.    Pursuant to N.J.S.A. 45:9-22-5(c)(3), the Codey Law's restrictions on patient referrals also do not apply to:

ambulatory surgery or procedures requiring anesthesia performed at a surgical practice registered with the Department of Health . . . or at an ambulatory care facility licensed by the Department of Health to perform surgical and related services or lithotripsy services, if the following conditions are met:

(a)    the practitioner who provided the referral personally performs the procedure;

(b)    the practitioner's remuneration as an owner of or investor in the practice or facility is directly proportional to the practitioner's ownership interest and not to the volume of patients the practitioner refers to the practice or facility;

(c)    all clinically-related decisions at a facility owned in part by non-practitioners are made by practitioners and are in the best interests of the patient; and

(d)    disclosure of the referring practitioner's significant beneficial interest in the practice or facility is made to the patient in writing, at or prior to the

time that the referral is made, consistent with the provisions of section 3 of P.L. 1989, c. 19 (C.45:9-22.6).

56.     Chiropractors and chiropractic practices in New Jersey which engage in self-referral arrangements that violate the Codey Law are not eligible to receive PIP Benefits.

57.     Pursuant to N.J.S.A. 39:6A-4, an insurer such as GEICO is only required to pay PIP Benefits in New Jersey for reasonable, necessary, and appropriate treatment. Concomitantly, a healthcare services provider in New Jersey is only eligible to receive PIP Benefits for medically necessary services.

58.     Pursuant to N.J.S.A. 39:6A-2(m):

"Medically necessary" means that the treatment is consistent with the symptoms or diagnosis, and treatment of the injury:

(1)     is not primarily for the convenience of the injured person or provider,

(2)     is the most appropriate standard or level of service which is in accordance with standards of good practice and standard professional treatment protocols, as such protocols may be recognized or designated by the Commissioner of Banking and Insurance, in consultation with the Commissioner of Health and Senior Services or with a professional licensing or certifying board in the Division of Consumer Affairs in the Department of Law and Public Safety, or by a nationally recognized professional organization, and

(3)     does not involve unnecessary diagnostic testing.

59.     Like New York, New Jersey has established a medical fee schedule (the "NJ Fee Schedule") that is applicable to claims for PIP Benefits.

60.     When a healthcare services provider submits a claim for PIP Benefits using the CPT codes set forth in the NJ Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not

excessive.

61.     New Jersey has a strong public policy against insurance fraud. This policy is manifested in a series of statutes, including the New Jersey Insurance Fraud Prevention Act ("IFPA"), N.J.S.A. 17:33A-1 et seq. A healthcare services provider violates the IFPA if, among other things, it:

> Presents or causes to be presented any written or oral statement as part of, or in support of or opposition to a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim; or

> Prepares or makes any written or oral statement that is intended to be presented to any insurance company or any insurance claimant in connection with, or in support of or in opposition to any claims for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim; or

> Conceals or knowing fails to disclose the occurrence of an event which affects a person's initial or continued right or entitlement to (a) any insurance benefits or payment or (b) the amount of any benefit or payment to which the person is entitled.

See N.J.S.A. 17:33A-4.

## II.     The Defendants' Fraudulent Scheme

62.     Beginning in 2015, and continuing through the present day, the Defendants masterminded and implemented a complex fraudulent scheme in which they billed GEICO and other automobile insurers millions of dollars for medically unnecessary, illusory, and otherwise non-reimbursable services.

63.     In or about mid-2015, Kogan and John Doe Defendants 1-5 commenced a search for a licensed chiropractor who would be willing to sell the use of his or her professional license to the Management Defendants so that the Management Defendants could fraudulently incorporate, own, and control a series of chiropractic professional corporations under the licensed chiropractor's name. The Management Defendants sought to purchase the use of the professional

chiropractic license in order to submit large-scale fraudulent no-fault billing to New York no-fault insurers.

64.     Beginning in or about late 2015, the Management Defendants recruited Caruso, a licensed chiropractor, who was willing to sell to the Management Defendants the use of his professional license, so that the Management Defendants could: (i) fraudulently incorporate Integrated Chiro, Brook Chiro, and Compass Chiro; and (ii) illegally assume ownership and control over preexisting medical professional corporations, including GC Chiro and Full Spine Chiro.

65.     The PC Defendants did not advertise or market their services to the general public.

66.     The PC Defendants were not the owners or leaseholders of the real property from which they purported to provide the Fraudulent Services.

67.     The PC Defendants operated from: (i) two multidisciplinary health clinics located in Brooklyn, which were owned and controlled by Kogan and the Management Defendants (the "Kogan Clinics"); and (ii) numerous other multidisciplinary healthcare clinics located throughout the New York metropolitan areas, including in Brooklyn, Queens and the Bronx (the "Kickback Clinics"), where the owners and controllers of the clinics arranged for Insureds who presented to be referred to the PC Defendants in exchange for payments, i.e., kickbacks, from the Management Defendants.

68.     Caruso did nothing to aid the start-up of the "practices" operated under his name at the Kogan Clinics or the Kickback Clinics.

69.     Caruso did not advertise for patients, never sought to build name recognition or make any legitimate efforts of his own to attract patients on behalf of any of the PC Defendants.

70.     Caruso did not have his own patients and did nothing to create or cultivate a patient base for any of the PC Defendants.

71.     As part of the scheme, the Defendants instituted a treatment protocol, often grounded on fabricated exams and reports, that sought to fraudulently justify excessive and medically unnecessary chiropractic treatment, electrodiagnostic testing, and chiropractic manipulation under anesthesia, without regard for Insureds' actual conditions.

**A.     The Fraudulent Incorporation and Operation of the PC Defendants**

72.     In late 2015, the Management Defendants recruited Caruso, a licensed chiropractor who was willing to sell them the use of his chiropractor license so that they could: (i) fraudulently incorporate Integrated Chiro, Brook Chiro, and Compass Chiro; and (ii) illegally assume ownership and control over preexisting medical professional corporations, including GC Chiro and Full Spine Chiro.

73.     In order to circumvent New York law preventing non-medical professionals from owning and controlling medical professional corporations, the Management Defendants entered into a secret scheme with Caruso, wherein, in exchange for a designated salary or other form of compensation, Caruso agreed to falsely represent in the certificate of incorporation and related filings with New York State, that he was the true shareholder, director, and officer of the PC Defendants and that he truly owned, controlled, and practiced through the professional corporation.

74.     Caruso did this knowing that the professional corporations would be used to submit fraudulent billing to insurers.

75.     Once Integrated Chiro, Brook Chiro, and Compass Chiro were fraudulently incorporated and the Management Defendants assumed ownership over GC Chiro and Full Spine

Chiro, Caruso ceded true beneficial ownership and control over the PC Defendants to the Management Defendants.

76.     The Management Defendants – rather than Caruso – provided all costs associated with establishing the PC Defendants in the Kogan Clinics and Kickback Clinics, and all investment in GC Chiro and Full Spine Chiro subsequent to the purchase of Caruso's chiropractic license by the Management Defendants in late 2015.

77.     Caruso did not incur any costs to establish the PC Defendants' practices, nor did he invest any money in the professional corporations he purportedly owned subsequent to the purchase of his chiropractic license by the Management Defendants.

78.     Upon fraudulent incorporation, the Management Defendants caused the PC Defendants to commence operations from at least two different multi-disciplinary no-fault clinics owned and/or controlled by the Management Defendants.

79.     In addition, the Management Defendants caused the PC Defendants to commence operations from numerous other New York area multi-disciplinary no-fault clinics by paying kickbacks and/or entering into illegal fee splitting arrangements with the owners and controllers of those clinics in exchange for patient referrals to the PC Defendants.

80.     Caruso never was the true shareholder, director, or officer of any of the PC Defendants, and never had any true ownership interest in or control over any of the professional corporations. True ownership and control over the PC Defendants always rested entirely with the Management Defendants, who used the façade of the PC Defendants to do indirectly what they were forbidden from doing directly, namely: (i) employ medical professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

81.     Caruso exercised little to no control over or ownership interest in the PC Defendants.

82.     All decision-making authority relating to the operation and management of the PC Defendants was vested entirely with the Management Defendants.

83.     In addition, Caruso never controlled or maintained any of the PC Defendants' books or records, including their bank accounts; never selected, directed, or controlled any of the individuals or entities responsible for handling any aspect of the PC Defendants' financial affairs; never hired or supervised any of PC Defendants' employees or independent contractors; and was completely unaware of the most fundamental aspects of how the PC Defendants operated.

**B.     The Management Defendants' Efforts to Conceal their Ownership and Control of the PC Defendants**

84.     To conceal their true ownership and control of the PC Defendants while simultaneously effectuating pervasive, total control over their operation and management, the Management Defendants arranged to have Caruso and the PC Defendants enter into a series of "lease," "management," "billing," and/or "marketing" agreements with themselves and entities they own or control, including other medical professional corporations.  These agreements called for exorbitant payments from the PC Defendants to the Management Defendants and for the performance of certain designated services including leasing, management, marketing, billing, and/or collections, regardless of the actual value of the services or space provided.

85.     While these agreements ostensibly were created to permit the Management Defendants to provide "facility space," "equipment," "management," "billing," and/or "marketing" services, they actually were used solely as a tool to permit the Management Defendants to: (i) control the day-to-day operations, exercise supervisory authority over, and

illegally own the PC Defendants; and (ii) to siphon all of the profits that were generated by the billings submitted to GEICO and other insurers through the PC Defendants.

86.     In certain instances, these agreements required Caruso and the PC Defendants to pay fees to other medical professional corporations that were also unlawfully owned and controlled by the Management Defendants.

87.     The net effect of these "lease," "management," "billing," and/or "marketing," agreements amongst Caruso, the PC Defendants, and the Management Defendants was to maintain the PC Defendants in a constant state of debt to the Management Defendants, thereby enabling the Management Defendants to maintain total control over the professional corporations, their accounts receivables, and any revenues that might be generated therefrom.

**C.     The Kogan Clinics and Kickback Clinics**

88.     The PC Defendants did not advertise or market their services to the general public and were not the owners or leaseholders of the real property from which they purported to provide the Fraudulent Services.

89.     Instead, the PC Defendants operated from at least two multidisciplinary clinics owned and controlled by Kogan and John Doe Defendants 1-5 located at 1611B East New York Avenue, Brooklyn, New York (the "East New York Clinic) and 150 Graham Avenue, Brooklyn, New York ("Graham Avenue Clinic") (collectively the "Kogan Clinics").

90.     As part of the Defendants' fraudulent scheme, Kogan purported to be the office manager at both the East New York Clinic and Graham Avenue Clinic.

91.     In actuality, Kogan used the façade of "office manager" to unlawfully own and control every aspect of the professional corporations operating from the Kogan Clinics, including the operations of the PC Defendants

92.     In keeping with Kogan's control over the Kogan Clinics and the professional corporations operating therefrom, Kogan has remained as the "office manager" for several years, despite numerous changes in the professional corporations and medical professionals working from the locations.

93.     In addition to the Kogan Clinics, the PC Defendants also operated from a series of multidisciplinary clinics, i.e., the Kickback Clinics, including, but not limited to, the following locations:

(i)      1 Fulton Avenue, Hempstead, New York

(ii)     10748 Guy Brewery Boulevard, Jamaica, New York

(iii)    1090 Coney Island Avenue, Brooklyn, New York

(iv)     1353 Utica Avenue, Brooklyn, New York

(v)      1500 Astor Avenue, Bronx, New York

(vi)     152-80 Rockaway Boulevard, Jamaica, New York

(vii)    1552 Ralph Avenue, Brooklyn, New York

(viii)   1568 Ralph Avenue, Brooklyn, New York

(ix)     172-17 Jamaica Avenue, Jamaica, New York

(x)      183-11 Hillside Avenue, Jamaica, New York

(xi)     1894 Eastchester Road, Bronx, New York

(xii)    2 Wilson Place, Mount Vernon, New York

(xiii)   2025 Davidson Avenue, Bronx, New York

(xiv)    205-20 Jamaica Avenue, Hollis, New York

(xv)     2184 Flatbush Avenue, Brooklyn, New York

(xvi)    222-01 Hempstead Avenue, Queens Village, New York

(xvii)      2363 Ralph Avenue, Brooklyn, New York

(xviii)     2451 E Tremont Avenue, Bronx, New York

(xix)       2510 Westchester Avenue, Suite 102, Bronx, New York

(xx)        2625 Atlantic Avenue, Brooklyn, New York

(xxi)       3250 Westchester Avenue Bronx, New York

(xxii)      3301 101st 2nd Fl., Queens, New York

(xxiii)     332 E 149th Street, Suite 200, Bronx, New York

(xxiv)      3407 White Plains Road, Bronx, New York

(xxv)       3432 E Tremont Avenue, Bronx, New York

(xxvi)      3910 Church Avenue, Brooklyn, New York

(xxvii)     4226 3rd Avenue, Bronx, New York

(xxviii)    424 E 147th Street, Bronx, New York

(xxix)      444 Willis Avenue, Bronx, New York

(xxx)       460 Grand Street, New York, New York

(xxxi)      5037 Broadway, New York, New York

(xxxii)     546 Howard Avenue, Brooklyn, New York

(xxxiii)    550 Remsen Avenue, Brooklyn, New York

(xxxiv)     5506 Avenue N, Brooklyn, New York

(xxxv)      5607 Avenue L, Brooklyn, New York

(xxxvi)     64 Nagle Avenue, Fl. 2, New York, New York

(xxxvii)    6937 Myrtle Avenue, Glendale, New York

(xxxviii)   717 Southern Boulevard, Bronx, New York

(xxxix)     764 Elmont Road, Elmont, New York

(xl)        80-12 Jamaica Avenue, Woodhaven, New York

(xli)       8225 Queens Boulevard, 1A, Elmhurst, New York

(xlii)      9046 Corona Avenue, Queens, New York

(xliii)     951 Brook Avenue, 2nd Floor, Bronx, New York

94.    The owners and controllers of the Kickback Clinics arranged for Insureds who presented to the clinics to be referred to the PC Defendants in exchange for kickbacks from the Management Defendants.

95.    The kickbacks that the Management Defendants provided to the Clinic owners and controllers were disguised as ostensibly legitimate fees to "rent" space or personnel from the Kickback Clinics. In actuality, these were "pay-to-play" arrangements that caused the Kickback Clinics to steer Insureds to the PC Defendants, with the amount of the fees based upon the volume of Insureds that were expected to be referred to the PC Defendants for "treatment".

96.    The subleases were shams, as they existed solely to create the appearance of a legitimate landlord/tent or sublessor/sublessee relationship between the PC Defendants and the Kickback Clinics.

97.    In exchange for the kickbacks from the Management Defendants, when an Insured visited one of the Kickback Clinics, he or she automatically was referred to one of the PC Defendants for bogus chiropractic treatment or electrodiagnostic testing, regardless of the Insured's individual symptoms or presentation.

98.    The referrals typically were made by a receptionist or some other non-medical personnel at the Kickback Clinics who simply directed or "steered" the Insureds to whichever Provider Defendant was active and present at the Clinic during that time period.

**E.      The Defendants' Fraudulent Treatment and Billing Protocol**

99.     Virtually all of the Insureds whom the Defendants purported to treat were involved in relatively minor, "fender-bender" accidents, to the extent that they were involved in any actual accidents at all. Concomitantly, virtually none of the Insureds whom the Defendants purported to treat suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced or purported to experience.

100.    Even so, the Defendants purported to subject virtually every Insured to a substantially identical, medically unnecessary course of "treatment" that was provided pursuant to predetermined, fraudulent protocols designed to maximize the billing that they could submit through GC Chiro, Integrated Chiro, Full Spine Chiro, Brook Chiro, and Compass Chiro to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to it.

101.    The Defendants purported to provide their predetermined fraudulent treatment protocols to Insureds without regard for the Insureds' individual symptoms, presentation, or – in most cases – the total absence of any actual medical problems arising from any actual automobile accidents.

102.    Each step in the Defendants' fraudulent treatment protocols was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent no-fault billing for each Insured.

103.    No legitimate chiropractor or other licensed healthcare provider or professional corporation would permit the fraudulent treatment and billing protocols described below to proceed under his or her auspices.

104.    The Defendants permitted the fraudulent treatment and billing protocols described below to proceed under their auspices because the Defendants sought to profit from the fraudulent billing submitted to GEICO and other insurers.

**1.    The Fraudulent Charges for Initial Examinations**

105.    Upon receiving an illegal referral from the Management Defendants at the Kogan Clinics or pursuant to the kickbacks that the Management Defendants paid to the owners and controllers of the Kickback Clinics from which they operated, the PC Defendants purported to provide virtually every Insured in the claims identified in Exhibits "1" - "5" with an initial examination.

106.    The initial examinations were performed as a "gateway" in order to provide Insureds with phony, predetermined "diagnoses" to allow the Defendants to then purport to provide medically unnecessary, illusory, or otherwise non-reimbursable chiropractic treatment, diagnostic testing, and chiropractic manipulation under anesthesia.

107.    Typically, either Caruso or one of numerous chiropractors present at the various clinics (the "Treating Chiropractors") purported to perform the initial examinations on behalf of the PC Defendants.

108.    As set forth in Exhibits "1" - "5", the initial examinations then were typically billed to GEICO through the PC Defendants under CPT code 99203 or 99204, typically resulting in a charge of either $54.74 or $78.00.

109.    The charges for the initial examinations were fraudulent in that the initial examinations were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to illegal referrals from the Management Defendants at the Kogan

Clinics or kickbacks that Caruso, the PC Defendants, and the Management Defendants paid at the Kickback Clinics, not to treat or otherwise benefit the Insureds.

110.   Furthermore, pursuant to the NY Fee Schedule, when the Defendants submitted charges for initial examinations under CPT code 99204, or caused them to be submitted, they represented that a chiropractor associated with the PC Defendants: (i) performed a "comprehensive" physical examination; and (ii) engaged in medical decision-making of "moderate complexity".

111.   Similarly, pursuant to the NY Fee Schedule, when the Defendants submitted charges for initial examinations under CPT code 99203, or caused them to be submitted, they represented that a chiropractor associated with the PC Defendants performed a "detailed" physical examination.

112.   As set forth below, however, the charges for the initial examinations were fraudulent in that they misrepresented the nature, extent, and results of the purported examinations.

**a.     Misrepresentations Regarding "Comprehensive" or "Detailed" Physical Examinations**

113.   Pursuant to the American Medical Association's CPT Assistant, which is incorporated by reference into the NY Fee Schedule, a physical examination does not qualify as "comprehensive" unless the examining chiropractor either: (i) conducts a general examination of multiple patient organ systems; or (ii) conducts a complete examination of a single patient organ system.

114.   Pursuant to the CPT Assistant, in the context of patient examinations, a chiropractor has not conducted a general examination of multiple patient organ systems unless the chiropractor has documented findings with respect to at least eight organ systems.

115.    Pursuant to the CPT Assistant, in the context of patient examinations, a chiropractor has not conducted a complete examination of a patient's musculoskeletal organ system unless the chiropractor has documented findings with respect to:

(i)      at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)     the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii)    examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)     examination of gait and station;

(vi)    examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)   inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)  coordination, deep tendon reflexes, and sensation; and

(ix)    mental status, including orientation to time, place and person, as well as mood and affect.

116.    In the claims identified in Exhibits "1" – "5", when the PC Defendants, Caruso, and the Treating Chiropractors billed for the initial examinations under CPT code 99204, they falsely represented that chiropractors associated with the PC Defendants performed "comprehensive" patient examinations on the Insureds they purported to treat during the initial examinations.

117.     In fact, with respect to the claims identified in Exhibit "1" – "5", neither Caruso, the Treating Chiropractors, nor any other healthcare services provider associated with the PC Defendants ever conducted a general examination of multiple patient organ systems, or conducted a complete examination of a single patient organ system.

118.     For instance, in each of the claims under CPT code 99204 identified in Exhibits "1" – "5", neither Caruso, the Treating Chiropractors, nor any other healthcare services provider associated with the PC Defendants ever conducted any general examination of multiple patient organ systems, inasmuch as they did not document findings with respect to at least eight organ systems.

119.     Furthermore, although Caruso and the Treating Chiropractors often purported to provide a more in-depth examination of the Insureds' musculoskeletal systems in the claims for initial examinations identified in Exhibits "1" – "5", the musculoskeletal examinations did not qualify as "complete", because they failed to document:

(i)      at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)     the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii)    examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)     palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)      examination of gait and station;

(vi)     examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)    inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)   coordination, deep tendon reflexes, and sensation; and/or

(ix)    mental status, including orientation to time, place and person, as well as mood and affect.

120.    Pursuant to the CPT Assistant, a "detailed" physical examination requires – among other things – that the healthcare services provider conduct an extended examination of the affected body areas and other symptomatic or related organ systems.

121.    To the extent that the Insureds in the claims identified in Exhibits "1" - "5" had any actual complaints at all as the result of their minor automobile accidents, the complaints were limited to minor musculoskeletal complaints.

122.    Pursuant to the CPT Assistant, in the context of patient examinations, a chiropractor has not conducted an extended examination of a patient's musculoskeletal organ system unless the chiropractor has documented findings with respect to the following:

(i)     measurement of any three of the following seven vital signs: (a) sitting or standing blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

(ii)    general appearance of patient (e.g., development, nutrition, body habitus, deformities, attention to grooming);

(iii)   examination of peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin and/or other location;

(v)     brief assessment of mental status;

(vi)    examination of gait and station;

(vii)   inspection and/or palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and

neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

(viii)   coordination;

(ix)   examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and

(x)   examination of sensation.

123. In the claims for initial examinations in Exhibits "1" - "5" in which the PC Defendants, Caruso, and the Management Defendants billed for the initial examinations under CPT code 99203, they falsely represented that Caruso, the Treating Chiropractors, or some other healthcare provider associated with the PC Defendants conducted a "detailed" patient examination of the Insureds they purported to treat during the initial examinations.

124. In fact, neither Caruso, the Treating Chiropractors, nor any other healthcare services provider associated with the PC Defendants even conducted a "detailed" patient examination of the Insureds, inasmuch as they did not conduct an extended examination of the Insureds' affected body areas and other symptomatic or related organ systems.

125. For example, in the claims for initial examinations identified in Exhibits "1" - "5", neither Caruso, the Treating Chiropractors, nor any other healthcare services provider associated with the PC Defendants ever conducted an extended examination of the Insureds' musculoskeletal systems, inasmuch as they did not document findings with respect to the following:

(i)   measurement of any three of the following seven vital signs: (a) sitting or standing blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

(ii)   general appearance of patient (e.g., development, nutrition, body habitus, deformities, attention to grooming);

(iii)   examination of peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)   palpation of lymph nodes in neck, axillae, groin and/or other location;

(v)   brief assessment of mental status;

(vi)   examination of gait and station;

(vii)   inspection and/or palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

(viii)   coordination;

(ix)   examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and/or

(x)   examination of sensation.

126.   In the claims for initial examinations under CPT codes 99203 and 99204 that are identified in Exhibits "1" - "5", the PC Defendants, Caruso, and the Treating Chiropractors, falsely represented that they had provided "detailed" or "comprehensive" physical examinations to the Insureds in order to create a false basis for their charges for the examinations under CPT codes 99203 and 99204, because examinations billable under CPT code 99203 and 99204 are reimbursable at higher rates than examinations that do not require the examining chiropractor to provide "detailed" or "comprehensive" physical examinations.

**b.   Misrepresentations Regarding the Extent of Medical Decision-Making**

127.   In addition, when the PC Defendants submitted charges for initial examinations under CPT code 99204, they represented that Caruso, the Treating Chiropractors, or some other healthcare provider associated with the PC Defendants engaged in medical decision-making of "moderate complexity".

128.     Pursuant to the CPT Assistant, which is incorporated by reference into the NY Fee Schedule, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant complications, morbidity, mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

129.     The CPT Assistant provides various clinical examples of the types of presenting problems that might require moderately-complex medical decision-making, and thereby justify the use of CPT code 99204 to bill for an initial patient examination. Specifically:

(i)     Office visit for initial evaluation of a 63-year-old male with chest pain on exertion. (Cardiology/Internal Medicine)

(ii)    Initial office visit of a 50-year-old female with progressive solid food dysphagia. (Gastroenterology)

(iii)   Initial office evaluation of a 70-year-old patient with recent onset of episodic confusion. (Internal Medicine)

(iv)    Initial office visit for 34-year-old patient with primary infertility, including counseling. (Obstetrics/Gynecology)

(v)     Initial office visit for 7-year-old female with juvenile diabetes mellitus, new to area, past history of hospitalization times three. (Pediatrics)

(vi)    Initial office evaluation of 70-year-old female with polyarthralgia. (Rheumatology)

(vii)   Initial office evaluation of a 50-year-old male with an aortic aneurysm with respect to recommendation for surgery. (Thoracic Surgery)

130.     Accordingly, pursuant to the CPT Assistant, the types of presenting problems that might legitimately require moderately complex medical decision-making, and thereby support

the use of CPT code 99204 to bill for an initial patient examination, typically are problems that pose a serious threat to the patient's health, or even the patient's life.

131.    By contrast, to the limited extent that the Insureds in the claims identified in Exhibits "1" - "5" had any presenting problems at all as the result of their minor automobile accidents, the problems virtually always were low severity soft tissue injuries such as sprains and strains at the outset.

132.    What is more, by the time the Insureds in the claims identified in Exhibits "1" - "5" presented to the PC Defendants for the putative initial examinations – typically weeks or even months after their accidents – the Insureds either did not have any genuine presenting problems at all as the result of their minor automobile accidents, or their presenting problems were minimal.

133.    Though the PC Defendants, Caruso, and the Treating Chiropractors routinely falsely represented that their initial examinations involved medical decision-making of "moderate complexity" (when billed under CPT code 99204), in actuality the initial examinations did not involve any medical decision-making at all.

134.    First, in virtually every case, the initial examinations did not involve the retrieval, review, or analysis of any medical records, diagnostic tests, or other information.

135.    When the Insureds presented to the PC Defendants for treatment, they did not arrive with any medical records. Furthermore, prior to the initial examinations, the Defendants neither requested any medical records from any other providers, nor provided any diagnostic tests.

136. Second, in virtually every case, there was no risk of significant complications or morbidity – much less mortality – from the Insureds' relatively minor complaints, to the extent that they ever had any complaints arising from automobile accidents at all.

137. Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided by the PC Defendants, Caruso, and the Treating Chiropractors, to the extent that they provided any such diagnostic procedures or treatment options in the first instance.

138. In almost every instance, any diagnostic procedures and "treatments" that the PC Defendants, Caruso, and the Treating Chiropractors actually provided were limited to a series of medically unnecessary chiropractic modalities, none of which was health- or life-threatening if properly administered.

139. Third, in virtually every case, neither Caruso, the Treating Chiropractors, nor any other healthcare services provider associated with the PC Defendants ever considered any significant number of diagnoses or treatment options for Insureds during the initial examinations.

140. Rather, to the extent that the initial examinations were conducted in the first instance, the PC Defendants, Caruso, and the Treating Chiropractors provided a nearly identical, predetermined "diagnosis" for every Insured, and prescribed a virtually identical course of treatment for every Insured.

141. Specifically, in almost every instance, during the initial examinations the Insureds did not report any medical problems that legitimately could be traced to an underlying automobile accident.

142. Even so, the PC Defendants, Caruso, and the Treating Chiropractors prepared initial examination reports in which they provided phony, boilerplate sprain/strain and similar,

objectively unverifiable soft tissue injury "diagnoses" to virtually every Insured, regardless of their individual circumstances or presentation.

143.    Then, based upon these supposed "diagnoses", the PC Defendants, Caruso, and the Treating Chiropractors directed Insureds to receive a litany of medically unnecessary services, including electrodiagnostic testing, computerized range of motion and muscle strength testing, physical performance testing, and chiropractic manipulation under anesthesia.

144.    There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

145.    An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

146.    As set forth above, in the claims identified in Exhibits "1" - "5", virtually all of the Insureds whom the PC Defendants, Caruso, and the Treating Chiropractors purported to treat were involved in relatively minor, "fender-bender" accidents, to the extent that they were involved in any actual accidents at all.

147.    It is extremely improbable that any two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibits "1" - "5" would suffer substantially identical injuries as the result of their accidents, or require a substantially identical course of treatment.

148.    It is even more improbable – to the point of impossibility – that this would occur repeatedly, often with the Insureds presenting at the PC Defendants with substantially identical injuries on the exact same dates after their accidents.

149.    Even so, in keeping with the fact that the PC Defendants, Caruso, and the

Treating Chiropractors' putative "diagnoses" were phony, and in keeping with the fact that the putative initial examinations involved no actual medical decision-making at all, the PC Defendants, Caruso, and the Treating Chiropractors frequently issued substantially identical "diagnoses", on the same date, to more than one Insured involved in a single accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds.

150.    For example:

(i)     On June 30, 2017, two Insureds – KA and AJ – were involved in the same automobile accident. More than two months later, KF and AJ presented – incredibly – on the exact same date, September 7, 2017, to Brooks Chiro for an initial examination pursuant to the kickbacks that Caruso and the Management Defendants paid in exchange for patient referrals. KF and AJ were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that KF and AJ suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, the Treating Chiropractor – at the Management Defendants' direction – provided KF and AJ with substantially identical, phony "diagnoses," and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(ii)    On June 5, 2016, two Insureds – AJ and SP – were involved in the same automobile accident. More than two months later, AJ and SP presented – incredibly – on the exact same date, August 22, 2016, to GC Chiro for an initial examination performed by Caruso pursuant to a referral from Kogan and the Management Defendants at the East New York Clinic. AJ and SP were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that AJ and SP suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Caruso – at the Management Defendants' direction – provided AJ and SP with substantially identical, phony "diagnoses," and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(iii)   On October 10, 2016, two Insureds – SM and GM – were involved in the same automobile accident. More than two months later, SM and GM presented – incredibly – on the exact same date, January 30, 2017, to Brooks Chiro for an initial examination performed by Caruso pursuant to the kickbacks that Caruso and the Management Defendants paid in exchange for patient referrals. SM and GM were different ages, in different physical condition, and experienced the

impact from different locations in the vehicle. To the extent that SM and GM suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Caruso – at the Management Defendants' direction – provided SM and GM with substantially identical, phony "diagnoses," and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(iv)    On February 14, 2019, two Insureds – EV and MV – were involved in the same automobile accident. Three months later, EV and MV presented – incredibly – on the exact same date, May 14, 2019, to GC Chiro for an initial examination performed by Arthur Schoenfeld, D.C. ("Schoenfeld") pursuant to the kickbacks that Caruso and the Management Defendants paid in exchange for patient referrals. EV and MV were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that EV and MV suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Schoenfeld – at the Management Defendants' direction – provided EV and MV with substantially identical, phony "diagnoses," and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(v)    On August 26, 2017, two Insureds – RD and LR – were involved in the same automobile accident. More than three months later, RD and LR presented – incredibly – on the exact same date, December 4, 2017, to Integrated Chiro for an initial examination performed by Caruso pursuant to the kickbacks that Caruso and the Management Defendants paid in exchange for patient referrals. RD and LR were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that RD and LR suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Caruso – at the Management Defendants' direction – provided RD and LR with substantially identical, phony "diagnoses," and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(vi)    On December 10, 2017, two Insureds – DM and EN – were involved in the same automobile accident. More than four months later, DM and EN presented – incredibly – on the exact same date, April 25, 2018, to Integrated Chiro for an initial examination performed by Caruso pursuant to the kickbacks that Caruso and the Management Defendants paid in exchange for patient referrals. DM and EN were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that DM and EN suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Caruso – at the Management Defendants' direction – provided DM and EN with substantially identical, phony "diagnoses," and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(vii)    On March 2, 2016, two Insureds – RM and AR – were involved in the same automobile accident. Almost four months later, DM and EN presented – incredibly – <u>on the exact same date</u>, June 24, 2016, to Full Spine Chiro for an initial examination performed by Caruso pursuant to the kickbacks that Caruso and the Management Defendants paid in exchange for patient referrals. RM and AR were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that RM and AR suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Caruso – at the Management Defendants' direction – provided RM and AR with substantially identical, phony "diagnoses," and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(viii)    On January 14, 2019, two Insureds – MA and RL – were involved in the same automobile accident. Almost four months later, MA and RL presented – incredibly – <u>on the exact same date</u>, May 6, 2019, to Compass Chiro for an initial examination performed by Caruso pursuant to the kickbacks that Caruso and the Management Defendants paid in exchange for patient referrals. MA and RL were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that MA and RL suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Caruso – at the Management Defendants' direction – provided MA and RL with substantially identical, phony "diagnoses," and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(ix)    On February 5, 2019, two Insureds – LD and JG – were involved in the same automobile accident. Almost two months later, LD and JG presented – incredibly – <u>on the exact same date</u>, April 3, 2019, to Compass Chiro for an initial examination performed by Caruso pursuant to the kickbacks that Caruso and the Management Defendants paid in exchange for patient referrals. LD and JG were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that LD and JG suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Caruso – at the Management Defendants' direction – provided LD and JG with substantially identical, phony "diagnoses," and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(x)    On January 6, 2016, two Insureds – NBH and KL – were involved in the same automobile accident. Almost six months later, NBH and KL presented – incredibly – <u>on the exact same date</u>, June 28, 2016, to Full Spine Chiro for an initial examination performed by Caruso pursuant to the kickbacks that Caruso and the Management Defendants paid in exchange for patient referrals. NBH and KL were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that NBH and KL

suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Caruso – at the Management Defendants' direction – provided NBH and KL with substantially identical, phony "diagnoses," and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

151.   These are only representative examples. In the claims for initial examinations that are identified in Exhibits "1" - "5", the PC Defendants, Caruso, and the Treating Chiropractors frequently issued substantially identical "diagnoses", on or about the same date, to more than one Insured involved in a single accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds, despite the fact that the Insureds were differently situated.

152.   The PC Defendants, Caruso, and the Treating Chiropractors routinely inserted these false "diagnoses" in their initial examination reports in order to create the false impression that the initial examinations required some legitimate medical decision-making, and in order to create a false justification for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

153.   In the claims for initial examinations identified in Exhibits "1" - "5", the PC Defendants, Caruso, and the Treating Chiropractors routinely falsely represented that the initial examinations involved "moderate complexity" medical decision-making in order to provide a false basis to bill for the initial examinations under CPT code 99204, because examinations billable under CPT code 99204 are reimbursable at a higher rate than examinations that do not require any moderately complex medical decision-making at all.

**2.     The Fraudulent Charges for Computerized Range of Motion and Muscle Strength Tests by GC Chiro and Full Spine Chiro**

154.   In an attempt to maximize the fraudulent billing that they submit or cause to be submitted for each Insured, Caruso and the PC Defendants also instructed many Insureds to

return to GC Chiro or Full Spine Chiro for one or more rounds of medically useless computerized range of motion and muscle strength tests.

155.    As set forth in Exhibits "1" and "3", Caruso, GC Chiro and Full Spine Chiro then purported to provide, and billed, the computerized range of motion tests to GEICO under CPT code 95851, and the computerized muscle strength tests to GEICO under CPT code 95831, typically resulting in over $250.00 in charges for every Insured who supposedly received the tests.

156.    The charges for the computerized range of motion and muscle strength tests were fraudulent in that the computerized range of motion and muscle strength tests were medically unnecessary and were performed pursuant to the Defendants' fraudulent treatment and billing protocol, not to legitimately treat or otherwise benefit the Insureds who were subjected to them.

a.    **Traditional Tests to Evaluate the Human Body's Range of Motion and Muscle Strength**

157.    The adult human body is made up of 206 bones joined together at various joints that either are of the fixed, hinged or ball-and-socket variety. The body's hinged joints and ball-and-socket joints facilitate movement, allowing a person to – for example – bend a leg, rotate a shoulder, or move the neck to one side.

158.    The measurement of the capacity of a particular joint to perform its full and proper function represents the joint's "range of motion". Stated in a more illustrative way, range of motion is the amount that a joint will move from a straight position to its bent or hinged position.

159.    A traditional, or manual, range of motion test consists of a non-electronic measurement of the joint's ability to move in comparison with an unimpaired or "ideal" joint. In a traditional range of motion test, the physician asks the patient to move his or her joints at

various angles, or the physician moves the joints. The physician then evaluates the patient's range of motion either by sight or through the use of a manual inclinometer or a goniometer (i.e., a device used to measure angles).

160.    Similarly, a traditional muscle strength test consists of a non-electronic measurement of muscle strength, which is accomplished by having the patient move his/her body in a given direction against resistance applied by the physician. For example, if a physician wanted to measure muscle strength in the muscles surrounding a patient's knee, he would apply resistance against the patient's leg while having him/her move the leg up, then apply resistance against the patient's leg while having him/her move the leg down.

161.    Physical examinations performed on patients with soft-tissue trauma – the alleged complaint advanced by virtually every Insured who treated with the PC Defendants – necessarily require range of motion and muscle strength tests, inasmuch as these tests provide a starting point for injury assessment and treatment planning. Unless a physician knows the extent of a given patient's joint or muscle strength impairment, there is no way to properly diagnose or treat the patient's injuries. Evaluation of range of motion and muscle strength is an essential component of the "hands-on" examination of a trauma patient.

162.    Since range of motion and muscle strength tests must be conducted as an element of a soft-tissue trauma patient's initial examination, as well as during any follow-up examinations, the Fee Schedule provides that range of motion and muscle strength tests are to be reimbursed as an element of the initial consultations and follow-up examinations.

163.    In other words, healthcare providers cannot conduct and bill for an initial consultation or follow-up examination, then bill separately for contemporaneously-provided computerized range of motion and muscle strength tests.

**b.** **The Duplicate Billing for Medically Unnecessary Computerized Range of Motion Tests**

164. Physicians and healthcare providers associated with the Kogan Clinics and Kickback Clinics purported to repeatedly conduct manual range of motion and muscle tests on virtually every Insured during each initial and/or follow-up examination.

165. The charges for these manual range of motion and manual muscle tests were part and parcel of the charges that the healthcare providers at the Kogan Clinics and Kickback Clinics routinely submitted for the initial examinations and follow-up examinations.

166. Despite the fact that every Insured already purportedly had undergone manual range of motion and muscle testing during their initial examinations and/or follow-up examinations, and despite the fact that reimbursement for range of motion and muscle testing already had been paid by GEICO as a component of reimbursement for the initial examinations and/or follow-up examinations, Caruso, GC Chiro, and Full Spine Chiro systemically billed for, and purported to provide, a series of medically unnecessary computerized range of motion and muscle strength tests to most Insureds.

167. Caruso, GC Chiro, and Full Spine Chiro purported to provide the computerized range of motion tests by placing a digital inclinometer or goniometer on various parts of the Insureds' bodies (affixed by Velcro straps) while the Insured was asked to attempt various motions and movements. The test was virtually identical to the manual range of motion testing that is described above and that purportedly was performed during each initial examination and follow-up examination, except that a digital printout was obtained rather than the provider manually documenting the Insured's range of motion.

168. Caruso, GC Chiro, and Full Spine Chiro purported to provide the computerized muscle strength tests by placing a strain gauge-type measurement apparatus against a stationary

object, against which the patient pressed three-to-four separate times using various muscle groups. As with the computerized range of motion and muscle strength tests, this computerized muscle strength test was virtually identical to the manual muscle strength testing that is described above and that purportedly was performed during the initial examinations and/or follow-up examinations – except that a digital printout was obtained.

169.    The information gained through the use of the computerized range of motion and muscle strength tests was not significantly different from the information obtained through the manual testing that was part and parcel of virtually every Insured's initial examination and follow-up examinations.

170.    In the relatively minor soft-tissue injuries allegedly sustained by the Insureds – to the extent that any of the Insureds suffered any injuries at all as the result of the automobile accidents they purported to experience – the difference of a few percentage points in the Insureds' range of motion reading or pounds of resistance in the Insureds' muscle strength testing was meaningless. This is evidenced by the fact that neither Caruso, the Treating Chiropractors, nor any other healthcare provider associated with the PC Defendants or the clinics from which they operated, ever incorporated the results of computerized range of motion and muscle strength tests into the rehabilitation programs of any of the Insureds whom they purported to treat.

171.    The computerized range of motion and muscle strength tests were part and parcel of the Defendants' fraudulent scheme, inasmuch as the "service" was rendered pursuant to a pre-established protocol that: (i) in no way aided in the assessment and treatment of the Insureds; and (ii) was designed solely to financially enrich the Defendants.

c.    **The Fraudulent Unbundling of Charges for the Computerized Range of Motion and Muscle Tests**

172.    Not only did Caruso, GC Chiro, and Full Spine Chiro deliberately purport to provide duplicative, medically unnecessary computerized range of motion and muscle strength tests, they also unbundled their billing for the tests in order to maximize the fraudulent charges that they could submit to GEICO.

173.    Pursuant to the Fee Schedule, when computerized range of motion testing and muscle testing are performed on the same date, all of the testing should be reported and billed using CPT code 97750.

174.    CPT code 97750, described as "Physical performance test or measurement (e.g., musculoskeletal, functional capacity), with written report, each 15 minutes," identifies a number of multi-varied tests and measurements of physical performance of a select area or number of areas. These tests include services such as extremity testing for strength, dexterity, or stamina, and muscle testing with torque curves during isometric and isokinetic exercise, whether by mechanized evaluation or computerized evaluation. They also include creation of a written report.

175.    CPT code 97750 is a "time-based" code that in the New York metropolitan area allows for a single charge of $45.71 for every 15 minutes of testing that is performed. Thus, if a provider performed 15 minutes of computerized range of motion and muscle testing, it would be permitted a single charge of $45.71 for the range of motion and muscle tests under CPT code 97750. If the provider performed 30 minutes of computerized range of motion and muscle testing, it would be permitted to submit two charges of $45.71 for the range of motion and muscle tests under CPT code 97750, resulting in total charges of $91.42, and so forth.

176.    Caruso, GC Chiro, and Full Spine Chiro routinely purported to provide computerized range of motion and muscle strength tests to Insureds on the same dates of service.

177.    To the extent that Caruso, GC Chiro, and Full Spine Chiro actually provided the computerized range of motion and muscle strength tests to Insureds in the first instance, the computerized range of motion and muscle strength tests together never took more than 15 minutes to perform. Thus, even if the computerized range of motion and muscle strength tests that Caruso, GC Chiro, and Full Spine Chiro purported to provide were medically necessary, and performed in the first instance, the providers would be limited to a single, time-based charge of $45.71 under CPT code 97750 for each date of service on which it provided computerized range of motion and muscle strength tests to an Insured.

178.    Even so, in order to maximize their fraudulent billing for the computerized range of motion and muscle strength tests, Caruso, GC Chiro, and Full Spine Chiro unbundled what should have been – at most – a single charge of $45.71 under CPT code 97750 for both computerized range of motion and muscle testing into: (i) multiple charges of $45.71 under CPT code 95851 (for the range of motion tests); and (ii) one or two charges of $43.60 under CPT code 95831 (for the muscle strength tests).

179.    By unbundling what should – at most – have been a single $45.71 charge under CPT code 97750 into multiple charges under CPT code 95851 and one or two charges under CPT code 95831, Caruso, GC Chiro, and Full Spine Chiro typically inflated the fraudulent computerized range of motion and muscle strength tests charges that they submitted to GEICO by an order of magnitude. Caruso, GC Chiro, and Full Spine Chiro routinely submitted billing for computerized range of motion and muscle strength tests rendered to an Insured on a single

date of service for amounts of more than $400.00 for each session of medically unnecessary computerized range of motion and muscle strength testing.

**d. The Fraudulent Misrepresentations Regarding the Existence of Written, Interpretive Reports for the Computerized Range of Motion and Muscle Strength Tests**

180. Not only were Caruso, GC Chiro, and Full Spine Chiro's charges for the computerized range of motion and muscle strength tests fraudulent because the tests were duplicative, medically unnecessary, and because the billing was fraudulently unbundled, but the charges also were fraudulent because they falsely represented that Caruso, GC Chiro, and Full Spine Chiro prepared written reports interpreting the test data.

181. Pursuant to the NY Fee Schedule, when a healthcare provider submits a charge for computerized range of motion testing using CPT code 95851 or for computerized muscle testing using CPT code 95831, the provider represents that it has prepared a written report interpreting the data obtained from the test.

182. The CPT Assistant states that "Interpretation of the results with preparation of a separate, distinctly, identifiable, signed written report is required when reporting codes 95851 and 95852".

183. The CPT Assistant also states that "[t]he language included in the code descriptor for use of these codes indicates, the preparation of a separate written report of the findings as a necessary component of the procedure" when using CPT code 95831 to charge for muscle testing.

184. Though Caruso, GC Chiro, and Full Spine Chiro routinely submitted billing for the computerized range of motion and muscle strength tests using CPT codes 95851 and 95831, Caruso, GC Chiro, and Full Spine Chiro did not prepare written reports interpreting the data obtained from the tests.

185.    Caruso, GC Chiro, and Full Spine Chiro did not prepare written reports interpreting the data obtained from the tests because the tests were not meant to impact any Insured's course of treatment. Rather, to the extent they were performed at all, the tests were performed as part of the Defendants' predetermined fraudulent billing and treatment protocol, and were designed solely to financially enrich the Defendants at the expense of GEICO and other insurers.

186.    In fact, to the extent that the computerized range of motion and muscle strength tests ever were performed in the first instance, they were performed – in their entirety – by unlicensed technicians whom Caruso, GC Chiro, and Full Spine Chiro treated as independent contractors, with no physician involvement whatsoever.

**3.      The Fraudulent Charges for Electrodiagnostic Testing by the PC Defendants**

187.    As set forth in Exhibits "1" – "5", based upon the fraudulent, predetermined "diagnoses" provided during the initial examinations, the Defendants purported to subject many Insureds to a series of medically unnecessary, useless, and illusory electrodiagnostic ("EDX") tests, including nerve conduction velocity ("NCV") tests, electromyography ("EMG") tests, and voltage nerve conduction threshold ("V-NCT") tests.

188.    Typically, Caruso and the Treating Chiropractors purported to perform the EDX tests, which then were billed to GEICO through all five PC Defendants.

189.    The charges for the EDX tests were fraudulent in that the EDX tests were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to the Defendants' fraudulent treatment protocol, the referrals from the Management Defendants at the Kogan Clinics, and the kickbacks that the Management Defendants paid at the Kickback Clinics, not to treat or otherwise benefit the Insureds.

a.      **The Human Nervous System and Electrodiagnostic Testing**

190.    The human nervous system is composed of the brain, spinal cord, and peripheral nerves that extend throughout the body, including through the arms and legs and into the hands and feet.

191.    Two primary functions of the nervous system are to collect and relay sensory information through the nerve pathways into the spinal cord and up to the brain, and to transmit signals from the brain into the spinal cord and through the peripheral nerves to initiate muscle activity throughout the body.

192.    The nerves responsible for collecting and relaying sensory information to the brain are called sensory nerves, and the nerves responsible for transmitting signals from the brain to initiate muscle activity throughout the body are called motor nerves.

193.    Peripheral nerves consist of both sensory and motor nerves. They carry electrical impulses throughout the body, originating from the spinal cord and extending, for example, into the hands and feet through the arms and legs.

194.    The segments of nerves closest to the spine and through which impulses travel between the peripheral nerves and the spinal cord are called the nerve roots.  A "pinched" nerve root is called a radiculopathy, and can cause various symptoms including pain, altered sensation and loss of muscle control.

195.    EMGs and NCVs are forms of EDX tests, and purportedly were provided by the Defendants because they were medically necessary to determine whether the Insureds had radiculopathies.

196. V-NCT tests purportedly are a form of electrodiagnostic test, and purportedly were provided by the Defendants because they were medically necessary to determine whether the Insureds had radiculopathies.

197. The American Association of Neuromuscular Electrodiagnostic Medicine ("AANEM"), which consists of thousands of neurologists and physiatrists and is dedicated solely to the scientific advancement of neuromuscular medicine, has adopted a recommended policy (the "Recommended Policy") regarding the optimal use of electrodiagnostic medicine in the diagnosis of various forms of neuropathies, including radiculopathies.

198. The Recommended Policy accurately reflects the demonstrated utility of various forms of electrodiagnostic tests and has been endorsed by two other premier professional medical organizations, the American Academy of Neurology and the American Academy of Physical Medicine and Rehabilitation.

199. According to the Recommended Policy, the maximum number of NCV tests necessary to diagnose a radiculopathy in 90 percent of all patients is: (i) NCV tests of three motor nerves; (ii) NCV tests of two sensory nerves; and (iii) two H-reflex studies.

200. According to the Recommended Policy, the maximum number of EMG tests necessary to diagnose a radiculopathy in 90 percent of all patients is EMG tests of two limbs.

201. According to the Recommended Policy, both NCV tests and EMG tests normally must be performed together in order to provide a clinical diagnosis of peripheral nervous system disorders, including radiculopathies. As the Recommended Policy states:

> Radiculopathies cannot be diagnosed by NCS [Nerve Conduction Studies] alone; needle EMG must be performed to confirm a radiculopathy. Therefore, these studies should be performed together by one physician supervising and/or performing all aspects of the study.
> …

The EDX laboratory must have the ability to perform needle EMGs. NCSs should not be performed without needle EMG except in unique circumstances."

202.    The Recommended Policy does not identify V-NCT tests as having any documented usefulness in diagnosing radiculopathies, because they do not have any usefulness in diagnosing radiculopathies.

**b.    The Fraudulent NCV Tests**

203.    NCV tests are non-invasive tests in which peripheral nerves in the arms and legs are stimulated with an electrical impulse to cause the nerve to depolarize. The depolarization, or "firing," of the nerve is transmitted, measured, and recorded with electrodes attached to the surface of the skin. An EMG machine then documents the timing of the nerve response (the "latency"), the magnitude of the response (the "amplitude"), and the speed at which the nerve conducts the impulse over a measured distance from one stimulus to another (the "conduction velocity").

204.    In addition, the EMG machine displays the changes in amplitude over time as a "waveform." The amplitude, latency, velocity, and shape of the response then should be compared with well-defined normal values to identify the existence, nature, extent, and specific location of any abnormalities in the sensory and motor nerve fibers.

205.    In order to be clinically useful in the diagnoses of peripheral nervous system disorders, NCVs and EMGs must be performed together.

206.    There are several motor and sensory peripheral nerves in the arms and legs that can be tested with NCV tests. Moreover, most of these peripheral nerves have both sensory and motor nerve fibers, either or both of which can be tested with NCV tests.

207.    F-wave and H-reflex studies are additional types of NCV tests that may be conducted in addition to the sensory and motor nerve NCV tests. F-wave and H-reflex studies

generally are used to derive the time required for an electrical impulse to travel from a stimulus site on a nerve in the peripheral part of a limb, up to the spinal cord, and then back again. The motor and sensory NCV studies are designed to evaluate nerve conduction in nerves within a limb.

208.     As set forth above, in many instances, the Managements Defendants, Caruso, and the PC Defendants submitted billing to GEICO for NCVs – or caused such billing to be submitted – despite the fact that no corresponding EMGs had been performed, making the tests useless in the diagnosis and treatment of the Insureds.

209.     In an attempt to extract the maximum billing out of each Insured who supposedly received NCV tests, Caruso, the Treating Chiropractors, and the PC Defendants – at the direction of the Management Defendants – routinely purported to test far more nerves than recommended by the Recommended Policy.

210.     Specifically, to maximize the fraudulent charges that they could submit to GEICO and other insurers, the Defendants routinely purported to perform and/or provide: (i) NCV tests of 10 motor nerves; (ii) NCV tests of 12 sensory nerves; (iii) multiple F-wave studies; and (iv) multiple H-reflex studies.

211.     For example, in the claims identified in Exhibits "1" – "5", the Defendants purported to provide this massive, medically unnecessary amount of NCV tests to – among many others – the following Insureds:

(i)        K███ A███;

(ii)       M███ A█-A███;

(iii)      F███ A██;

(iv)      R██ A███;



(v)     J███ B███;

(vi)    K████ B███;

(vii)   A███ C███;

(viii)  A███ C█████;

(ix)    M██ D███;

(x)      L███ E███;

(xi)    A███ F███;

(xii)   K███ H███;

(xiii)  J███ J███;

(xiv)  F██ J██;

(xv)   I██ K██;

(xvi)  J███ L████;

(xvii) J███ L███;

(xviii) S████ M███;

(xix)  R████ P██; and

(xx)   A████ R███

212.    The decision of which peripheral nerves to test in each limb and whether to test the sensory fibers, motor fibers, or both sensory and motor fibers in any such peripheral nerve must be tailored to each patient's unique circumstances.

213.    In a legitimate clinical setting, this decision is determined based upon a history and physical examination of the individual patient, as well as the real-time results obtained as the NCV tests are performed on particular peripheral nerves and their sensory and/or motor fibers.

As a result, the nature and number of the peripheral nerves and the type of nerve fibers tested with NCV tests should vary from patient-to-patient.

214.     This concept is emphasized in the Recommended Policy, which states that:

EDX studies [such as NCVs] are individually designed by the electrodiagnostic consultant for each patient.  The examination design is dynamic and often changes during the course of the study in response to new information obtained.

215.     This concept also is emphasized in the CPT Assistant, which states that "Pre-set protocols automatically testing a large number of nerves are not appropriate."

216.     Caruso, the Treating Chiropractors, and the PC Defendants did not tailor the NCVs they purported to perform and/or provide to the unique circumstances of each individual Insured.

217.     Instead, they applied a fraudulent "protocol" and purported to perform and/or provide NCVs on the same peripheral nerves and nerve fibers in virtually all of the NCV claims identified in Exhibits "1" – "5".

218.     In particular, Caruso, the Treating Chiropractors, and the PC Defendants purported to test some combination of the following peripheral nerves and nerve fibers – and, in most cases, all of them – in virtually all of the NCV test claims identified in Exhibits "1" – "5":

(i)      left and right median motor nerves;

(ii)     left and right ulnar motor nerves;

(iii)    left and right peroneal motor nerves;

(iv)     left and right radial motor nerves;

(v)      left and right tibial motor nerves;

(vi)     left and right ulnar motor nerves;

(vii)    left and right median sensory nerves;

(viii)    left and right radial sensory nerves;

(ix)    left and right saphenous sensory nerves;

(x)    left and right ulnar sensory nerves.

(xi)    left and right superficial peroneal sensory nerves; and

(xii)    left and right sural sensory nerves;

219.    The cookie-cutter approach to the NCV tests that Caruso, the Treating Chiropractors, and the PC Defendants purported to provide to Insureds clearly was not based on medical necessity. Instead, the cookie-cutter approach to the NCV tests was designed solely to maximize the charges that the Defendants could submit to GEICO and other insurers, and to maximize their ill-gotten profits.

220.    Assuming that all other conditions of coverage are satisfied, the NY Fee Schedule permitted lawfully licensed healthcare providers in the New York metropolitan area to submit maximum charges of: (i) $106.47 under CPT code 95904 for each sensory nerve in any limb on which an NCV test was performed; (ii) $166.47 under CPT code 95903 for each motor nerve in any limb on which an NCV test was performed; and (iii) $119.99 under CPT code 95934 for each H-Reflex test that was performed on the nerves of any limb.

221.    Caruso, the Treating Chiropractors, and the PC Defendants – at the direction of the Management Defendants – purported to provide and/or perform NCV tests on far more nerves than recommended by the Recommended Policy so as to maximize the fraudulent charges that could be submitted to GEICO and other insurers, not because the NCV tests were medically necessary.

**c.      The Fraudulent EMG Tests**

222.    Caruso, the Treating Chiropractors, and the PC Defendants also purported to perform medically unnecessary EMGs on Insureds as part of the Defendants' fraudulent treatment and billing protocol.

223.    EMGs involve insertion of a needle into various muscles in the spinal area ("paraspinal muscles") and in the arms and/or legs to measure electrical activity in each such muscle. The sound and appearance of the electrical activity in each muscle are compared with well-defined norms to identify the existence, nature, extent, and specific location of any abnormalities in the nerve roots, peripheral nerves, or muscles.

224.    There are many different muscles in the arms and legs that can be tested using EMGs. The decision of how many limbs and which muscles to test in each limb should be tailored to each patient's unique circumstances. In a legitimate clinical setting, this decision is based upon a history and physical examination of each individual patient, as well as the real-time results obtained from the EMGs as they are performed on each specific muscle. As a result, the number of limbs as well as the nature and number of the muscles tested through EMGs should vary from patient-to-patient.

225.    Though, in many cases, EMG tests are purportedly provided on Insureds in order to determine whether the Insureds suffered from radiculopathies, no adequate neurological history and examination is performed to create a foundation for the EDX testing. In actuality, the EMG tests are performed on Insureds as part of the Defendants' predetermined, fraudulent testing and treatment protocol designed to maximize the billing that they submit for each Insured.

226.    The performance of the EMGs is not tailored to the unique circumstances of each patient. Instead, Caruso, the Treating Chiropractors, and the PC Defendants routinely purported to test the same muscles in the same limbs, without regard for individual patient presentation.

227.    Furthermore, even if there were any need for any of these EMGs, the nature and number of the EMGs that are generally performed grossly exceed the maximum number of such tests – i.e., EMGs of two limbs – that should be necessary in at least 90 percent of all patients with a suspected diagnosis of radiculopathy. Typically, Caruso, the Treating Chiropractors, and the PC Defendants purport to conduct EMGs on all four limbs, in contravention of the Recommended Policy, in order to maximize the fraudulent billing that they can submit or cause to be submitted to GEICO and other insurers.

228.    More specifically, if all other conditions of coverage are satisfied, the Fee Schedule permits lawfully licensed physicians in the metropolitan New York area to submit maximum EMG charges of: (i) $185.73 under CPT code 95860 if an EMG is performed on at least five muscles of one limb; (ii) $241.50 under CPT code 95861 if an EMG is performed on at least five muscles in each of two limbs; (iii) $314.34 under CPT code 95863 if an EMG is performed on at least five muscles in each of three limbs; and (iv) $408.64 under CPT code 95864 if an EMG is performed on at least five muscles in each of four limbs.

229.    Caruso, the Treating Chiropractors, and the PC Defendants typically purported to perform EMGs on muscles in all four limbs for Insureds solely to maximize the profits that they can reap from each such Insured.

230.    Caruso, the PC Defendants, and the Management Defendant utilized this fraudulent treatment and billing protocol to increase by an order of magnitude the charges for EDX testing that they submitted, or caused to be submitted, to GEICO and other insurers.

Through their fraudulent billing practices, the PC Defendants routinely submitted billing in excess of $2,300.00 for Insureds who purportedly received: (i) a four-limb EMG; (ii) NCVs of ten motor nerves with F-wave studies; (iii) NCVs of twelve sensory nerves; and (iv) two H-reflex studies, all of which were medically unnecessary and were purportedly performed – to the extent they were performed at all – merely to maximize the fraudulent charges that the PC Defendants and the Management Defendant submitted to GEICO and other insurers.

231.   What is more, in further keeping with the fact that Caruso, the Treating Chiropractors, and the Management Defendants purported to perform the EDX tests pursuant to a fraudulent, predetermined treatment and billing protocol, and without regard to patient care, in at least some cases, no one associated with the PC Defendants actually performed the EMGs, even though the PC Defendants and the Management Defendants billed GEICO for both EMGs and NCVs.

232.   Numerous Insureds reported that they could not recall whether the EMG portion of the test involved the insertion of a needle or involved any pain, even though EMGs involve insertion of a needle into various muscles in the spinal area and in the arms and/or legs to measure electrical activity in each such muscle, and are commonly considered painful.

233.   The PC Defendants' failure to provide EMGs contemporaneous with their purported NCVs renders the NCVs medically useless, and potentially compromised the care of the Insureds, according to the Recommended Policy.

234.   According to the Recommended Policy, both NCV tests and EMG tests normally are required for a clinical diagnosis of peripheral nervous system disorders, including radiculopathies.  As the Recommended Policy states:

> Radiculopathies cannot be diagnosed by NCS [Nerve Conduction Studies] alone; needle EMG must be performed to confirm a radiculopathy. Therefore, these

studies should be performed together by one physician supervising and/or performing all aspects of the study.

\*       \*       \*

The EDX laboratory must have the ability to perform needle EMGs. NCSs should not be performed without needle EMG except in unique circumstances.

See Exhibit "5".

235.    Therefore, not only did Caruso, the PC Defendants, and the Management Defendant bill for services they did not actually provide (i.e. the EMG tests), but any NCV tests that were performed without a contemporaneous EMG were of no diagnostic value whatsoever and therefore medically useless.

236.    No legitimate physician exercising independent medical judgment would permit the fraudulent treatment and billing protocol described above to proceed under his or her auspices.

237.    Caruso, the Treating Chiropractors, and the PC Defendants routinely purported to perform medically unnecessary EMGs – to the extent they were performed at all – so as to maximize the fraudulent charges that they submitted to GEICO and other insurers.

**d.      The Fraudulent V-NCT Tests**

**(1)      Legitimate Tools for Neuropathy Diagnosis**

238.    There are three primary diagnostic tools that are well-established in the medical, neurological, and radiological communities for diagnosing the existence, nature, extent, and specific location of abnormalities in the peripheral nerves (i.e., neuropathies), which include radiculopathies. These diagnostic tests are nerve conduction velocity ("NCV") tests, electromyography ("EMG") tests, and magnetic resonance imaging ("MRI") tests.

239.     Except in very limited circumstances, for diagnostic purposes NCV tests and EMG tests are performed together if: (i) nerve damage is suspected following an auto accident; (ii) the damage cannot be fully evaluated through a physical examination or other generally accepted diagnostic technique; and (iii) the tests are necessary to determine an appropriate treatment plan.

240.     If NCV tests and EMG tests are necessary to diagnose nerve damage, they should be performed no fewer than 14-21 days following an automobile accident because it typically takes at least that long for nerve damage to appear following a trauma.

241.     MRI testing is an imaging technique that can produce high quality images of the muscle, bone, tissue and nerves inside the human body. MRIs often are used following automobile accidents to diagnose abnormalities in the nerve roots through images of the nerves, nerve roots and surrounding areas.

### (2)     The Medically Useless V-NCT Tests

242.     The V-NCT test is a supposed sensory nerve threshold test that purports to diagnose abnormalities only in the sensory nerves and sensory nerve roots. It does not, and cannot, provide any diagnostic information regarding the motor nerves and motor nerve roots.

243.     V-NCT tests are performed by administering electricity through specific skin sites to stimulate sensory nerves in the arms, legs, hands, feet and/or face. The voltage amplitude is increased until the patient states that he or she perceives a sensation from the stimulus caused by the voltage. "Findings" then are made by comparing the minimum voltage stimulus required for the patient to announce that he or she perceives some sensation from it with purported normal ranges.

244.    In actuality, however, there are no reliable, peer-reviewed data that establish normal response ranges in V-NCT testing.

245.    If the patient's sensation threshold is greater than the purported normal range of amplitude required to evoke a sensation, it allegedly indicates that the patient has a hypoesthetic condition (i.e., that the patient's sensory nerves have decreased function). If the amplitude required for the patient to announce that he perceives a sensation is less than the supposed normal range of intensity to evoke a sensation, it allegedly indicates that the patient has a hyperesthetic condition (i.e., that the patient's sensory nerves are in a hypersensitive state).

246.    The sensory nerves are comprised of three different kinds of nerve fibers, the A-beta fibers, the A-delta fibers and the C fibers. The V-NCT tests allegedly can diagnose the existence, nature, extent and location of any abnormal condition in each of these specific nerve fibers by using three different frequencies of electrical current. Specifically, the use of electrical currents with frequencies of 5 Hz, 250 Hz and 2000 Hz allegedly stimulate and thereby test the C fibers, the A-delta fibers and the A-beta fibers, respectively.

247.    Though Caruso, GC Chiro, Full Spine Chiro, and Brook Chiro purported to subject many Insureds to V-NCT tests, supposedly to diagnose radiculopathies, the V-NCT tests were medically useless because virtually every Insured who purportedly was subjected to the V-NCT tests by Caruso, GC Chiro, Full Spine Chiro, and Brook Chiro also received, at or about the same time, NCVs, EMGs, and/or MRIs.

248.    Even if the V-NCT tests purportedly provided by Caruso, GC Chiro, Full Spine Chiro, and Brook Chiro had any legitimate value in the diagnosis of neuropathies, they were duplicative of the NCV tests, EMG tests, and MRIs that the Insureds received and that, in any

case, provided far more specific, sensitive, and reliable diagnostic information than the V-NCT tests that Caruso, GC Chiro, Full Spine Chiro, and Brook Chiro purported to provide.

249. The supposed primary benefit of the V-NCT tests is that they allegedly can diagnose abnormalities in the sensory nerves less than 14-21 days following an accident, which is sooner than NCV tests and EMG tests can be used to effectively diagnose nerve damage following an accident.

250. However, Caruso, GC Chiro, Full Spine Chiro, and Brook Chiro frequently purported to provide V-NCT tests to Insureds <u>after</u> the same Insureds purportedly received NCV tests and EMG tests from other healthcare providers, or contemporaneously with the NCV tests and EMG tests that were purportedly provided.

251. Under the circumstances in which they were employed by Caruso, GC Chiro, Full Spine Chiro, and Brook Chiro, the purported V-NCT tests constituted a purposeful and unnecessary duplication of the NCV tests and EMG tests that the Insureds virtually always supposedly received contemporaneously with the V-NCT tests, and in many cases before the V-NCT tests.

252. Even assuming that there was some diagnostic value for V-NCT tests, the V-NCT tests in these circumstances could not possibly have provided any diagnostic information of any value beyond that which was produced through NCVs, EMGs and/or MRIs.

253. In any case, there are no legitimate data to support the use of V-NCT tests to diagnose neuropathies in general or radiculopathies in particular.

254. There is no reliable evidence of the existence of normal ranges of intensity or amplitude required to evoke a sensation using a V-NCT test device. Given the lack of evidence

of normal ranges of intensity required to evoke a sensation, it is impossible to determine whether any given Insured's personal V-NCT test results are or are not abnormal.

255. Even if there was some evidence of the existence of normal ranges of intensity required to evoke a sensation using a V-NCT test device, there is no reliable evidence to prove that a sensation threshold greater than the normal range would indicate a <u>hypo</u>esthetic condition or that sensation threshold less than the normal range would indicate a <u>hyper</u>esthetic condition.

256. Even if an abnormal sensation threshold indicated either a <u>hypo</u>esthetic or <u>hyper</u>esthetic condition, there is no reliable evidence to prove that the extent or cause of any such conditions could be identified from V-NCT tests. Indeed, there are numerous pathological and physiological conditions other than peripheral nerve damage that can cause hyperesthesia and hypoesthesia.

257. Furthermore, even if V-NCT tests could produce any valid diagnostic information regarding the sensory nerve fibers:

    (i)    there is no reliable evidence to prove that any such information would have any value beyond that which could be gleaned from a routine history and physical examination of the patient;

    (ii)    there is no reliable evidence to prove that any such information would indicate the nature or extent of any abnormality in the sensory nerves or sensory nerve roots;

    (iii)    there is no reliable evidence to prove that any such information would indicate the specific location of the abnormality along the sensory nerve pathways;

    (iv)    V-NCT tests do not provide any information regarding the motor nerves or motor nerve roots which are at least as likely as the sensory nerves or sensory nerve roots to be injured in an auto accident; and

    (v)    there would be no legitimate diagnostic advantage to using V-NCT tests to obtain information regarding the sensory nerve fibers where, as here, the V-NCT tests were duplicative of contemporaneously-provided NCV tests, EMG tests, and MRIs.

258.    In keeping with the fact that Caruso, GC Chiro, Full Spine Chiro, and Brook Chiro's purported V-NCT tests were medically useless, the Centers for Medicare & Medicaid Services ("CMS") have determined that V-NCT tests are not medically reasonable and necessary for diagnosing sensory neuropathies (i.e., abnormalities in the sensory nerves) and radiculopathies and are therefore not compensable.

259.    In keeping with the fact that Caruso, GC Chiro, Full Spine Chiro, and Brook Chiro's putative V-NCT tests were medically unnecessary, the American Medical Association's Physicians' Current Procedural Terminology handbook, which establishes thousands of CPT codes for healthcare providers to use in describing their services for billing purposes, does not recognize a CPT code for V-NCT tests.

260.    In keeping with the fact that Caruso, GC Chiro, Full Spine Chiro, and Brook Chiro's purported V-NCT tests were medically useless, the putative "results" of the Defendants' V-NCT tests were not incorporated into any Insured's treatment plan, and the V-NCT tests played no genuine role in the treatment or care of the Insureds.

### (3)    Each of the Two Main V-NCT Test Device Manufacturers Claims the Other is a Fraud

261.    Until 2004, about the same time when CMS was considering the medical benefits of V-NCT testing before ultimately issuing its National Coverage Determination that denied Medicare coverage of V-NCT tests, the two primary manufacturers of sensory nerve conduction threshold devices were Neurotron, Inc., and Neuro Diagnostic Associates, Inc.

262.    Neurotron, Inc. manufactured a device called the "Neurometer". Neuro Diagnostic Associates, Inc. manufactured a device called the "Medi-Dx 7000". While the physics and engineering behind the Neurometer and the Medi-Dx 7000 differ, each of the devices purported to provide quantitative data on sensory nerve conduction threshold.

263. In or about 2004, following the issuance of the CMS National Coverage Determination, Neuro Diagnostic Associates, Inc. renamed and/or reorganized itself as PainDx, Inc., and re-branded its Medi-Dx 7000 device as the "Axon-II".

264. Neuro Diagnostic Associates, Inc.'s last known business address and telephone number is identical to that currently used by PainDx, Inc. Moreover, the technical specifications of the Medi-Dx 7000 are virtually identical to the Axon-II.

265. Notwithstanding the Medi-Dx 7000's cosmetic re-branding as the Axon-II, Neurotron, Inc. claims that neither device produces valid data or results, and that both the Medi-Dx 7000 and Axon-II have been fraudulently marketed. For its part, Neuro Diagnostic Associates, Inc. had asserted the same claims regarding Neurotron, Inc.'s Neurometer device.

266. Among the charges made by Neurotron, Inc. against the Medi-Dx 7000 are that: (i) there is no reliable evidence that the type of electrical wave forms (asymmetrical wave forms) used by the Medi DX 7000 stimulate or provide any useful diagnostic information regarding any specific kind of sensory nerve fiber; (ii) the alternating output of electrical current used by the Medi-Dx 7000 is "severely distorted by skin impedance" (e.g., texture, thickness, temperature of the skin etc.) making it "impossible" to determine the true intensity levels of the electrical current being delivered by the Medi-Dx 7000; (iii) the Medi-Dx 7000 protocols are "incapable of measuring the thresholds in the sensory nerves"; and (iv) there are no peer-reviewed studies that validate the tests performed using the Medi-Dx 7000.

267. Because the Axon-II is virtually identical to the Medi-Dx 7000, any and all of Neurotron, Inc.'s criticisms of the Medi-Dx 7000 also apply to the Axon-II/Medi-DX 7000.

**(4)    Caruso, GC Chiro, Full Spine, and Brook Chiro's Fraudulent V-NCT Test "Reports"**

268.    In support of their fraudulent charges for the V-NCT tests, Caruso, GC Chiro, Full Spine Chiro, and Brook Chiro submitted phony V-NCT test "reports" which falsely represented that an actual chiropractor had some role in performing and interpreting the tests.

269.    Caruso, GC Chiro, Full Spine Chiro, and Brook Chiro's bills for the V-NCT tests likewise falsely represented that an actual chiropractor had some role in performing and interpreting the tests.

270.    In actuality, to the extent that the V-NCT tests were performed in the first instance, they were performed by unlicensed technicians, and neither Caruso, nor any other licensed healthcare provider associated with GC Chiro, Full Spine Chiro, or Brook Chiro, had any role whatsoever in interpreting the test results.

271.    In keeping with the fact that the V-NCT tests were performed – to the extent that they were performed at all – by unlicensed technicians, rather than by a licensed chiropractor associated with GC Chiro, Full Spine Chiro, or Brook Chiro, the putative test "reports" did not contain any genuine interpretation of the test data.

272.    Instead, aside from reporting the putative V-NCT data that supposedly were derived from the respective Insureds' tests, the boilerplate V-NCT test "reports" each contained identical "Diagnostic Discussion" and "Diagnostic Summary" sections that did not vary from patient-to-patient and were included solely to foster the illusion that a licensed healthcare professional had some role in performing or interpreting the tests.

273.    For instance, each of Caruso, GC Chiro, Full Spine Chiro, and Brook Chiro's purported V-NCT test reports contained the following, identical "Diagnostic Summary" section:

Higher amplitudes identify pathology with statistical sensitivity approaching 100%. Due to CNS interconnectivity sensory pathology influences conduction to adjacent nerves so correlation of the history and other findings is essential to differentiate secondary lesions, and is necessary before initiating or changing treatment. Lower than normal amplitudes

correlate with irritation and may suggest possible adjacent inflammatory activity, which warrants investigation to rule in or out possible concomitant pathology. Normal findings do not rule out non-neurogenic etiologies.

Lumbar radiculopathy can be objectively confirmed with lateral bending radiographic studies. Proprioceptive disruption causes the spinous processes above and below an affected nerve root to rotate away from the side of lateral bending, which is contrary to normal motion toward the side of lateral bending. Radiographs are made with patient running his hand down the lateral thigh to the limit of motion without pelvic rotation.

274.     Other than the boilerplate "Diagnostic Summary" sections of the purported V-NCT test reports, the reports did not contain any interpretation of the data that Caruso, GC Chiro, Full Spine Chiro, and Brook Chiro purported to obtain from the tests.

275.     Caruso, GC Chiro, Full Spine Chiro, and Brook Chiro's billed for the V-NCT tests as if they were provided by licensed healthcare providers, rather than by the unlicensed technicians, to make it appear as if the services were eligible for reimbursement. The Defendants' misrepresentations were consciously designed to mislead GEICO into believing that it was obligated to pay for these services, when in fact GEICO was not.

**e.      The Fraudulent Radiculopathy "Diagnoses"**

276.     Radiculopathies are relatively rare in motor vehicle accident victims, occurring in – at most – 19 percent of accident victims according to a large-scale, peer-reviewed 2009 study conducted by Randall L. Braddom, M.D., Michael H. Rivner, M.D., and Lawrence Spitz, M.D. and published in Muscle & Nerve, the official journal of the AANEM.

277.     Furthermore, the cohort of accident victims considered in the study by Drs. Braddom, Rivner, and Spitz had been referred to a tertiary EDX testing laboratory at a major university teaching hospital, and therefore represented a more severely injured group of patients than the Insureds whom the Defendants purportedly treated.

278.     As a result, the frequency of radiculopathy in <u>all</u> motor vehicle accident victims – not only those who have relatively serious injuries that require referral to a major hospital EDX laboratory – is likely to be significantly lower than 19 percent.

279.     Virtually none of the Insureds whom Caruso and the PC Defendants purported to treat suffered any serious medical problems as the result of any automobile accident, much less any radiculopathy.

280.     Even so, Caruso, the Treating Chiropractors, and the PC Defendants falsely purported to diagnose radiculopathies in the substantial majority of the Insureds that purportedly received V-NCT testing, despite the fact that V-NCT tests cannot legitimately be used to diagnose radiculopathies.

281.     Caruso, the Treating Chiropractors, and the PC Defendants purported to arrive at their predetermined radiculopathy diagnoses in order to create the appearance of severe injuries and thereby provide a false justification for the medically unnecessary Fraudulent Services provided through the Defendants.

**f.      The Illegal Self-Referrals for Electrodiagnostic Testing**

282.     After obtaining their initial patient referrals from the Management Defendants at the Kogan Clinics or pursuant to the kickbacks that the Management Defendants paid to the owners and controllers of the Kickback Clinics from which they operated, Caruso and the PC Defendants then engaged in a subsequent pattern of illegal self-referrals designed to: (i) maximize their fraudulent billing opportunities with respect to each Insured; and simultaneously (ii) minimize the amount of fraudulent billing submitted through any one of the PC Defendants with respect to any individual Insured, and thereby conceal and perpetuate their scheme.

283.   In the claims identified in Exhibits "1" – "5", Caruso and the Management Defendants caused the Insureds to be referred from one PC Defendant to another for electrodiagnostic testing.

284.   For example:

(i)   On or about November 7, 2018, Caruso and the Management Defendants caused an Insured named "AK" to be referred from Integrated Chiro, where he had been purporting to provide him with chiropractic manipulation without anesthesia, to GC Chiro for purported electrodiagnostic testing.

(ii)   On or about May 2, 2017, Caruso and the Management Defendants caused an Insured named "MA" to be referred from GC Chiro, where he had been purporting to provide him with chiropractic manipulation without anesthesia, to Brook Chiro for purported electrodiagnostic testing.

(iii)   On or about September 21, 2017, Caruso and the Management Defendants caused an Insured named "MAA" referred from GC Chiro, where he had been purporting to provide him with chiropractic manipulation without anesthesia, to Brook Chiro for purported electrodiagnostic testing.

(iv)   On or about May 2, 2017, Caruso and the Management Defendants caused an Insured named "SA" referred from GC Chiro, where he had been purporting to provide him with chiropractic manipulation without anesthesia, to Brook Chiro for purported electrodiagnostic testing.

(v)   On or about November 27, 2018, Caruso and the Management Defendants caused an Insured named "SA" to be referred from Integrated Chiro, where he had been purporting to provide him with chiropractic manipulation without anesthesia, to GC Chiro for purported electrodiagnostic testing.

(vi)   On or about December 19, 2018, Caruso and the Management Defendants caused an Insured named "SA" to be referred from Integrated Chiro, where he had been purporting to provide him with chiropractic manipulation without anesthesia, to GC Chiro for purported electrodiagnostic testing.

(vii)   On or about June 29, 2017, Caruso and the Management Defendants caused an Insured named "LA" referred from GC Chiro, where he had been purporting to provide him with chiropractic manipulation without anesthesia, to Brook Chiro for purported electrodiagnostic testing.

(viii)   On or about April 19, 2017, Caruso and the Management Defendants caused an Insured named "JA" referred from GC Chiro, where he had been purporting to

provide him with chiropractic manipulation without anesthesia, to Brook Chiro for purported electrodiagnostic testing.

(ix)     On or about May 10, 2018, Caruso and the Management Defendants caused an Insured named "EB" referred from Integrated Chiro, where he had been purporting to provide him with chiropractic manipulation without anesthesia, to Brook Chiro for purported electrodiagnostic testing.

(x)      On or about July 12, 2018, Caruso and the Management Defendants caused an Insured named "FB" referred from Integrated Chiro, where he had been purporting to provide him with chiropractic manipulation without anesthesia, to Brook Chiro for purported electrodiagnostic testing.

**4.     The Fraudulent Charges for Manipulation Under Anesthesia at GC Chiro and Full Spine Chiro**

285.    As set forth in Exhibits "1" and "3", based upon the fraudulent, predetermined "diagnoses" provided during the initial examinations, Caruso, the Treating Chiropractors, GC Chiro, and Full Spine Chiro purported to subject many Insureds to chiropractic manipulation under anesthesia ("MUA").

286.    In most cases, Caruso and the Treating Chiropractors purported to perform the MUA, which was billed to GEICO through GC Chiro of Full Spine Chiro as multiple charges under CPT codes 22505, 23700, 27194, 27198, and 27275.

287.    MUA involves a series of mobilization, stretching, and traction procedures performed on a patient's musculoskeletal system, while the patient is under sedation.

288.    Anesthesia is purportedly used to reduce pain, spasms, and muscle guarding that otherwise might occur in an unsedated patient.

289.    MUA is a moderately accepted treatment for a limited set of isolated joint conditions, such as arthrofibrosis of the knee and adhesive capsulitis, as well as to reduce displaced fractures.

290. MUA is experimental, investigational, and unproven for use on most areas of the body, including the spine and pelvis. There is a dearth of quality supportive scientific evidence for spinal or pelvic MUA.

291. Little evidence exists showing the long-term benefits of MUA.

292. Like the Defendants' charges for all of the other Fraudulent Services, the charges for the MUA were fraudulent in that the services were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to the phony boilerplate "diagnoses" that the Defendants provided following the purported initial examinations, not to treat or otherwise benefit the Insureds.

**a.      The Defendants' Medically Unnecessary MUA**

293. Virtually every Insured who purportedly received MUA from Caruso supposedly had their spine or pelvis manipulated.

294. Given the lack of quality scientific evidence supporting the use of MUA on the spine or pelvis, the MUA purportedly provided by Caruso, GC Chiro, and Full Spine Chiro to GEICO Insureds plainly was not medically necessary.

295. Furthermore, MUA only should be considered in cases where more conservative treatment, such as chiropractic manipulation without anesthesia or physical therapy, has proved ineffective.

296. This is because: (i) there is a large body of quality scientific evidence supporting the use of more conservative treatment, such as chiropractic manipulation without anesthesia or physical therapy, to treat soft tissue injuries to the spine and pelvis; (ii) there is a lack of quality scientific evidence supporting the use of MUA on the spine and pelvis; and (iii) procedures

requiring anesthesia – including MUA – involve a level of risk to the patient that are not present in procedures that do not require anesthesia.

297.   Even if MUA was a recognized form of treatment for soft tissue injuries to the spine or pelvis – and it is not – the MUA purportedly provided by Caruso, GC Chiro, and Full Spine Chiro was provided without regard to whether more conservative treatment had been effective.

298.   In keeping with the fact that the MUA purportedly provided by Caruso, GC Chiro, and Full Spine Chiro was provided without regard to whether more conservative treatment had been effective, in the claims identified in Exhibits "1" and "3" Insureds routinely continued to receive conservative treatment following the purported MUA, including physical therapy and chiropractic without anesthesia.

299.   In virtually all of the claims for MUA identified in Exhibits "1" and "3", the Insureds had not failed a proper course of conservative treatment before Caruso, GC Chiro, and Full Spine Chiro purported to subject them to MUA.

300.   To the contrary, in virtually every case in which Caruso, GC Chiro, and Full Spine Chiro purported to subject an Insured to MUA, the treatment notes from other healthcare services providers who treated the Insureds indicated that the Insureds' conditions were improving through more conservative treatments such as chiropractic manipulation without anesthesia and physical therapy.

301.   In keeping with fraudulent and exploitative nature of the MUA services billed through GC Chiro and Full Spine Chiro, Caruso routinely reported procedure times which could not possibly have allowed sufficient time for the treatments and procedures he purported to provide.

**b.      The Fraudulent Billing for Treatment of Non-Existent Pelvic Ring Injuries**

302.    To the extent that Caruso, GC Chiro, and Full Spine Chiro provided any MUA to Insureds in the first instance, the MUA purportedly was provided in New Jersey through GC Chiro or Full Spine and therefore was subject to the prevailing rates under the NJ Fee Schedule, as discussed above.

303.    In keeping with the lack of scientific evidence supporting the use of MUA, the NY Fee Schedule provides minimal, if any, reimbursement for the MUA procedures billed through GC Chiro and Full Spine Chiro.

304.    Accordingly, Caruso, GC Chiro, and Full Spine Chiro always purported to provide the medically unnecessary MUA in New Jersey, where the NJ Fee Schedule allows for greater reimbursement rates than if the same services had been performed in New York

305.    While the NJ Fee Schedule does permit licensed healthcare services providers to bill for MUA in the very limited cases in which MUA is medically necessary, it also imposes significant limits on the amounts that providers can bill for MUA.

306.    For example, the NJ Fee Schedule rules provide, among other things, that CPT code 22505 – which covers spinal manipulation under anesthesia – can be billed only once per Insured, per date of service, assuming that it is medically necessary, which in this case it was not.

307.    What is more, pursuant to the NJ Fee Schedule, chiropractors in northern New Jersey – where the Defendants purported to provide their MUA – can bill only $214.24 under CPT code 22505, assuming that the underlying spinal MUA is medically necessary, which in this case it was not.

308. Likewise, pursuant to the NJ Fee Schedule, chiropractors in northern New Jersey can bill only $323.19 for CPT code 27275, which covers MUA of the hip, assuming that the underlying hip MUA is medically necessary, which in this case it was not.

309. Caruso, GC Chiro, Full Spine Chiro, and the Management Defendants were dissatisfied with these limitations on their fraudulent billing for medically unnecessary MUA.

310. In an attempt to maximize the amount of fraudulent billing that they could submit to GEICO for their medically unnecessary MUA procedures, Caruso, GC Chiro, and Full Spine Chiro routinely falsely represented that the purported MUA involved a procedure billable under CPT codes 27194 or 27198.

311. Pursuant to the NJ Fee Schedule and the CPT Assistant, CPT code 27194 is the code used to bill for the treatment of "pelvic ring fracture, dislocation, diastasis or subluxation".

312. Effective January 1, 2017, the American Medical Association replaced CPT code 27194 with CPT code 27198.

313. Pursuant to the CPT Assistant, CPT code 27198 is the code used to bill for the treatment of "pelvic ring fracture(s), dislocation(s), diastasis or subluxation of the ilium, sacroiliac joint, and/or sacrum, with or without anterior pelvic ring factures(s) and/or dislocations(s) of the pubic symphysis and/or superior/inferior rami, unilateral or bilateral; with manipulation, requiring more than local anesthesia".

314. Pursuant to the NJ Fee Schedule, the maximum reimbursable amount under CPT codes 27194 or 27198 was $2,095.30, in keeping with the fact that pelvic ring fracture, dislocation, diastasis or subluxation are serious problems that are difficult and time-consuming to properly treat.

315.    None of the Insureds in the claims for MUA services identified in Exhibits "1" and "2" suffered from any pelvic ring fracture, dislocation, diastasis, or subluxation or – indeed – any other injury to their respective pelvic rings.

316.    Even so, and as set forth in Exhibits "1" and "3", Caruso, GC Chiro, and Full Spine Chiro routinely billed for their purported MUA using CPT code 27194, and thereby falsely represented that the Insureds suffered from some sort of pelvic ring fracture, dislocation, diastasis, or subluxation.

317.    For instance:

(i)    On or about May 26, 2016, Caruso, GC Chiro, and Full Spine Chiro submitted a bill to GEICO for CPT code 27194 with respect to an Insured named EG, and thereby falsely represented that they treated EG's purported pelvic ring fracture, dislocation, diastasis, or subluxation. In fact, EG had not suffered any pelvic ring fracture, dislocation, diastasis, subluxation, or – indeed – any injury to his pelvic ring at all.

(ii)    On or about June 2, 2016, Caruso, GC Chiro, and Full Spine Chiro submitted a bill to GEICO for CPT code 27194 with respect to an Insured named CP, and thereby falsely represented that they treated PC's purported pelvic ring fracture, dislocation, diastasis, or subluxation. In fact, PC had not suffered any pelvic ring fracture, dislocation, diastasis, subluxation, or – indeed – any injury to his pelvic ring at all.

(iii)    On or about October 13, 2016, Caruso, GC Chiro, and Full Spine Chiro submitted a bill to GEICO for CPT code 27194 with respect to an Insured named JC, and thereby falsely represented that they treated JC's purported pelvic ring fracture, dislocation, diastasis, or subluxation. In fact, JC had not suffered any pelvic ring fracture, dislocation, diastasis, subluxation, or – indeed – any injury to his pelvic ring at all.

(iv)    On or about October 13, 2016, Caruso, GC Chiro, and Full Spine Chiro submitted a bill to GEICO for CPT code 27194 with respect to an Insured named MM, and thereby falsely represented that they treated MM's purported pelvic ring fracture, dislocation, diastasis, or subluxation. In fact, MM had not suffered any pelvic ring fracture, dislocation, diastasis, subluxation, or – indeed – any injury to his pelvic ring at all.

(v)    On or about October 15, 2016, Caruso, GC Chiro, and Full Spine Chiro submitted a bill to GEICO for CPT code 27194 with respect to an Insured named AS, and

thereby falsely represented that they treated AS's purported pelvic ring fracture, dislocation, diastasis, or subluxation. In fact, AS had not suffered any pelvic ring fracture, dislocation, diastasis, subluxation, or – indeed – any injury to her pelvic ring at all.

(vi)    On or about October 22, 2016, Caruso, GC Chiro, and Full Spine Chiro submitted a bill to GEICO for CPT code 27194 with respect to an Insured named RD, and thereby falsely represented that they treated RD's purported pelvic ring fracture, dislocation, diastasis, or subluxation. In fact, RD had not suffered any pelvic ring fracture, dislocation, diastasis, subluxation, or – indeed – any injury to his pelvic ring at all.

(vii)   On or about December 3, 2016, Caruso, GC Chiro, and Full Spine Chiro submitted a bill to GEICO for CPT code 27194 with respect to an Insured named RB, and thereby falsely represented that they treated RB's purported pelvic ring fracture, dislocation, diastasis, or subluxation. In fact, RB had not suffered any pelvic ring fracture, dislocation, diastasis, subluxation, or – indeed – any injury to his pelvic ring at all.

(viii)  On or about May 26, 2016, Caruso, GC Chiro, and Full Spine Chiro submitted a bill to GEICO for CPT code 27194 with respect to an Insured named DB, and thereby falsely represented that they treated DB's purported pelvic ring fracture, dislocation, diastasis, or subluxation. In fact, DB had not suffered any pelvic ring fracture, dislocation, diastasis, subluxation, or – indeed – any injury to his pelvic ring at all.

318.    In keeping with the fact that none of the Insureds who purportedly received MUA in the claims identified in Exhibits "1" and "3" actually suffered from any injury to their pelvic rings, and in keeping with the fact that none of those Insureds actually received any services from the Defendants that were billable under CPT codes 27194 or 27198, the MUA treatment notes generated by Caruso, GC Chiro, and Full Spine Chiro routinely failed to reflect any legitimate injuries to, or treatment of, the Insureds' pelvic rings.

319.    The Defendants' use of CPT codes 27194 and 27198 to bill for their putative MUA procedures constituted a deliberate misrepresentation of the service that was provided, so as to maximize the amount of fraudulent billing that they could submit for each purported MUA procedure.

c.      **The Illegal Self-Referrals for MUA**

320.     What is more, the charges for the MUA were fraudulent in that they misrepresented GC Chiro and Full Spine Chiro's entitlement to reimbursement for the MUA in the first instance. In fact, GC Chiro and Full Spine Chiro were not eligible to receive reimbursement for the MUA, not only because they paid kickbacks in exchange for patient referrals, and not only because the MUA was medically unnecessary, but also because the MUA charges were the product of unlawful self-referrals.

321.     In the claims identified in Exhibits "1" and "3", the pattern of illegal self-referrals for chiropractic manipulation under anesthesia typically proceeded, in violation of the Codey Law, as follows:

(i)      Caruso caused Insureds to be referred from GC Chiro to GC Chiro or from Full Spine Chiro to Full Spine Chiro for purported chiropractic manipulation under anesthesia provided at a New Jersey ambulatory surgery center; and

(ii)     the practitioners who made the referrals did not personally perform the resulting chiropractic manipulation under anesthesia.

322.     For example:

(i)      On or about December 21, 2015, Caruso caused an Insured named "JC" to be referred from Full Spine Chiro to Full Spine Chiro for chiropractic manipulation under anesthesia. However, the resulting chiropractic manipulation under anesthesia was performed – to the extent that it was performed at all – by Dipti Patel, D.C. ("Patel"), rather than by Caruso, the practitioner who made the referral.

(ii)     On or about October 22, 2016, Caruso caused an Insured named "RD" to be referred from Full Spine Chiro to Full Spine Chiro for multiple sessions of chiropractic manipulation under anesthesia. However, the resulting chiropractic manipulation under anesthesia was performed – to the extent that it was performed at all – by Patel and Stephen Matrangolo, D.C. ("Matrangolo"), rather than by Caruso, the practitioner who made the referral.

(iii)    On or about May 19, 2016, Caruso caused an Insured named "EG" to be referred from GC Chiro to GC Chiro for chiropractic manipulation under anesthesia. However, the resulting chiropractic manipulation under anesthesia was performed

– to the extent that it was performed at all – by Matrangolo, rather than by Caruso, the practitioner who made the referral.

(iv)   On or about October 13, 2016, Caruso caused an Insured named "MM" to be referred from Full Spine Chiro to Full Spine Chiro for multiple sessions of chiropractic manipulation under anesthesia. However, the resulting chiropractic manipulation under anesthesia was performed – to the extent that it was performed at all – by Patel, Matrangolo, and Harris Moore, D.C. ("Moore"), rather than by Caruso, the practitioner who made the referral.

(v)   On or about October 14, 2015, Caruso caused an Insured named "NN" to be referred from GC Chiro to GC Chiro for chiropractic manipulation under anesthesia. However, the resulting chiropractic manipulation under anesthesia was performed – to the extent that it was performed at all – by Patel, rather than by Caruso, the practitioner who made the referral.

(vi)   On or about May 19, 2016, Caruso caused an Insured named "CP" to be referred from GC Chiro to GC Chiro for chiropractic manipulation under anesthesia. However, the resulting chiropractic manipulation under anesthesia was performed – to the extent that it was performed at all – by Matrangolo, rather than by Caruso, the practitioner who made the referral.

(vii)   On or about October 15, 2016, Caruso caused an Insured named "AS" to be referred from Full Spine Chiro to Full Spine Chiro for multiple sessions of chiropractic manipulation under anesthesia. However, the resulting chiropractic manipulation under anesthesia was performed – to the extent that it was performed at all – by Matrangolo, rather than by Caruso, the practitioner who made the referral.

## 6.   The Fraudulent Charges for Chiropractic

323.   As part of the Defendants' fraudulent treatment protocol, PC Defendants purported to subject Insureds to a series of medically unnecessary chiropractic treatments.

324.   Like the Defendants' charges for the other Fraudulent Services, the charges for chiropractic treatment were fraudulent in that the services were performed – to the extent they were performed at all – pursuant to the illegal kickback arrangements and Defendants' predetermined fraudulent billing and treatment protocol designed solely to maximize profits. This predetermined, fraudulent protocol was grounded on boilerplate examinations and reports

used to support excessive and medically unnecessary acupuncture services not warranted by the patients' conditions.

325.    Virtually none of the Insureds who presented to the PC Defendants for treatment suffered any injuries at all as the result of the minor automobile accidents they purportedly experienced, much less any injuries requiring months of chiropractic services.

326.    In most cases, the Insureds did not go to the hospital at all following their putative accidents and, to the extent that they did visit a hospital or other legitimate healthcare provider after their accidents, they virtually always were briefly observed on an outpatient basis and then sent on their way after an hour or two.

327.    Nonetheless, pursuant to the Defendants' fraudulent treatment and billing protocol, following their initial examinations and follow-up examinations, virtually every Insured was prescribed a extended course of chiropractic services designed to maximize profits without regard to genuine patient care.

**E.    The Fraudulent Billing for Independent Contractor Services**

328.    The Defendants' fraudulent scheme also included submission of claims to GEICO seeking payment for services performed by independent contractors.

329.    Under the New York no-fault insurance laws, professional corporations are ineligible to bill for or receive payment for goods or services provided by independent contractors – the healthcare services must be provided by the professional corporations, themselves, or by their employees.

330.    Since 2001, the New York State Insurance Department consistently has reaffirmed its longstanding position that professional corporations are not entitled to receive reimbursement under the New York no-fault insurance laws for healthcare providers performing services as

independent contractors. See DOI Opinion Letter, February 21, 2001 ("where the health services are performed by a provider who is an independent contractor with the PC and is not an employee under the direct supervision of a PC owner, the PC is not authorized to bill under No-Fault as a licensed provider of those services"); DOI Opinion Letter, February 5, 2002 (refusing to modify position set forth in 2-11-01 Opinion letter despite a request from the New York State Medical Society); DOI Opinion Letter, March 11, 2002 ("If the physician has contracted with the PC as an independent contractor, and is not an employee or shareholder of the PC, such physician may not represent himself or herself as an employee of the PC eligible to bill for health services rendered on behalf of the PC, under the New York Comprehensive Motor Vehicle Insurance Reparations Act…"); DOI Opinion Letter, October 29, 2003 (extending the independent contractor rule to hospitals); See DOI Opinion Letter, March 21, 2005 (DOI refused to modify its earlier opinions based upon interpretations of the Medicare statute issued by the CMS).

331.    Caruso was the only healthcare services provider employed by the PC Defendants and by his unincorporated chiropractic practice.

332.    Even so, the Defendants routinely submitted charges to GEICO and other insurers on behalf of the PC Defendants for Fraudulent Services that purportedly were performed by chiropractors and unlicensed technicians other than Caruso, including but not limited to the Treating Chiropractors.

333.    To the extent that they were performed in the first instance, all of the Fraudulent Services performed by healthcare services providers other than Jacobson were performed by chiropractors and unlicensed technicians whom Caruso, the Management Defendants, and, the PC Defendants treated as independent contractors.

334.    For instance, Caruso, the Management Defendants, and the PC Defendants:

(i)      paid the chiropractors and unlicensed technicians, either in whole or in part, on a 1099 basis rather than a W-2 basis;

(ii)     established an understanding with the chiropractors and unlicensed technicians that they were independent contractors, rather than employees;

(iii)    paid no employee benefits to the chiropractors and unlicensed technicians;

(iv)     failed to secure and maintain W-4 or I-9 forms for the chiropractors and unlicensed technicians;

(v)      failed to withhold federal, state or city taxes on behalf of the chiropractors and unlicensed technicians;

(vi)     compelled the chiropractors and unlicensed technicians to pay for their own malpractice insurance at their own expense;

(vii)    permitted the chiropractors and unlicensed technicians to set their own schedules and days on which they desired to perform services;

(viii)   permitted the chiropractors and unlicensed technicians to maintain non-exclusive relationships and perform services for their own practices and/or on behalf of other medical practices;

(ix)     failed to cover the chiropractors and unlicensed technicians for either unemployment or workers' compensation benefits; and

(x)      filed corporate and payroll tax returns (e.g. Internal Revenue Service ("IRS") forms 1120 and 941) that represented to the IRS and to the New York State Department of Taxation that the chiropractors and unlicensed technicians were independent contractors.

335.     By electing to treat the chiropractors and unlicensed technicians as independent contractors, the Defendants realized significant economic benefits – for instance:

(i)      avoiding the obligation to collect and remit income tax as required by 26 U.S.C. § 3102;

(ii)     avoiding payment of the FUTA excise tax required by 26 U.S.C. § 3301 (6.2 percent of all income paid);

(iii)    avoiding payment of the FICA excise tax required by 26 U.S.C. § 3111 (7.65 percent of all income paid);

(iv)   avoiding payment of workers' compensation insurance as required by New York Workers' Compensation Law § 10;

(v)   avoiding the need to secure any malpractice insurance; and

(vi)   avoiding claims of agency-based liability arising from work performed by the chiropractors and unlicensed technicians.

336.   In keeping with the fact that – except for services actually performed by Caruso – the Fraudulent Services were provided by independent contractors, the PC Defendants purported to utilize at least twenty-four different licensed chiropractors since 2016.

337.   Because the chiropractors and unlicensed technicians were independent contractors and performed the Fraudulent Services, Caruso and the PC Defendants never had any right to bill for or collect PIP Benefits in connection with those services.

338.   Caruso, the PC Defendants, and the Management Defendants billed for the Fraudulent Services as if they were provided by actual employees of the PC Defendants and Jacobson's unincorporated chiropractic practice to make it appear as if the services were eligible for reimbursement.

339.   Caruso, the PC Defendants, and the Management Defendants' misrepresentations were consciously designed to mislead GEICO into believing that it was obligated to pay for these services, when in fact GEICO was not.

340.   In some cases, Caruso, the PC Defendants, and the Management Defendants attempted to conceal the fact that the Fraudulent Services were performed by independent contractors by falsely listing Caruso on the billing as the treating provider, when in fact he did not provide the underlying treatments.

## IV.   The Fraudulent Billing the Defendants Submitted or Caused to be Submitted to GEICO

341.    To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of NF-3 forms and treatment reports through the PC Defendants to GEICO seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

342.    The NF-3 forms and treatment reports submitted to GEICO by and on behalf of the Defendants were false and misleading in the following material respects:

(i)     The NF-3 forms and treatment reports submitted by and on behalf of the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary and, in many cases, misrepresented to GEICO that the Fraudulent Services actually were performed. In fact, the Fraudulent Services were not medically necessary, in many cases were not actually performed, and were performed – to the extent that they were performed at all – pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

(ii)    The NF-3 forms and treatment reports submitted by and on behalf of the Defendants uniformly misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided.

(iii)   The NF-3 forms and treatment reports submitted by and on behalf of the Defendants uniformly misrepresented to GEICO that the PC Defendants were lawfully licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12).  In fact, the PC Defendants were not properly licensed in they were putative healthcare practices that illegally were owned and controlled by unlicensed individuals, and which illegally split fees with unlicensed individuals.

(iv)    The NF-3 forms and treatment reports submitted by and on behalf of the Defendants uniformly misrepresented to GEICO that the PC Defendants were are in compliance with all material licensing laws and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12).  In fact, the PC Defendants were not in compliance with all material licensing laws in that they paid illegal kickbacks for patient referrals.

(v)     In many cases, the NF-3 forms and treatment reports submitted by and on behalf of the Defendants misrepresented to GEICO that the PC Defendants were eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11 for the services that supposedly were performed. In fact, the PC Defendants were not eligible to seek or pursue collection of No-Fault

Benefits for the services that supposedly were performed because the services were not provided by the PC Defendants' employees

## V.    The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

343.    The Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

344.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

345.    Specifically, they knowingly misrepresented and concealed facts related to the PC Defendants in an effort to prevent discovery that the PC Defendants were fraudulently licensed, unlawfully split fees with unlicensed persons, and/or unlawfully paid kickbacks for patient referrals.

346.    Additionally, the Defendants entered into complex financial arrangements with one another and with others that were designed to, and did, conceal that fact that the PC Defendants were fraudulently licensed, unlawfully split fees with unlicensed persons, and unlawfully paid kickbacks in exchange for patient referrals.

347.    Furthermore, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and performed pursuant to a fraudulent predetermined protocol designed to maximize the charges that could be submitted.

348.    The billing and supporting documentation submitted by the Defendants, when viewed in isolation, also does not reveal the fraudulent predetermined protocols employed.

349.     In addition, the Defendants knowingly misrepresented and concealed facts related to the employment status of the physicians, nurse practitioners, physical therapists, and unlicensed individuals with the PC Defendants in order to prevent GEICO from discovering that the physicians, nurse practitioners, physical therapists, and unlicensed individuals performing many of the Fraudulent Services – to the extent that they were performed at all – were not employed by the PC Defendants. In many cases, the Defendants actually misrepresented the identity of the individual who purportedly performed the Fraudulent Services, or falsely claimed that the individuals providing the Fraudulent Services were employees of the PC Defendants, in order to conceal the fact that the services were performed by independent contractors.

350.     What is more, the Defendants billed for the Fraudulent Services through multiple individuals and entities using multiple tax identification numbers in order to reduce the amount of billing submitted through any single individual or entity or under any single tax identification number, thereby preventing GEICO from identifying the pattern of fraudulent charges submitted through any one entity.

351.     The Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full.

352.     GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $1,460,000.00 based upon the fraudulent charges.

353.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

**FIRST CAUSE OF ACTION**
**Against the PC Defendants**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

354.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

355.    There is an actual case in controversy between GEICO and the PC Defendants regarding more than $2,100,000.00 in fraudulent billing for the Fraudulent Services that has been submitted to GEICO, including more than $816,049.00 in pending fraudulent billing from GC Chiro; more than $150,730.00 in pending fraudulent billing from Integrated Chiro; more than $175,719.00 in pending fraudulent billing from Full Spine Chiro; more than $831,224.86 in pending fraudulent billing from Brook Chiro; and more than $222,616.00 in pending fraudulent billing from Compass Chiro.

356.    The PC Defendants have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

357.    The PC Defendants have no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services never were provided in the first instance.

358.    The PC Defendants have no right to receive payment for any pending bills submitted to GEICO because the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

359.    The PC Defendants have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback arrangements between the Defendants and others.

360.    The PC Defendants have no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services – to the extent that they were provided at all – were provided by independent contractors, rather than by the PC Defendants' employees.

361.    The PC Defendants have no right to receive payment for any pending bills submitted to GEICO because the PC Defendants were fraudulently licensed, owned, and controlled by unlicensed individuals and, therefore, were ineligible to bill for or to collect no-fault benefits.

362.    The PC Defendants have no right to receive payment for any pending bills submitted to GEICO because the PC Defendants unlawfully split fees with unlicensed individuals and, therefore, were ineligible to bill for or to collect No-Fault Benefits.

363.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the PC Defendants have no right to receive payment for any pending bills submitted to GEICO.

## SECOND CAUSE OF ACTION
### Against Caruso and Kogan
### (Violation of RICO, 18 U.S.C. § 1962(c))

364.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above.

365.    GC Chiro is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

366.    Caruso, Kogan, and John Doe Defendants 1-5 knowingly conducted and/or participated, directly or indirectly, in the conduct of the GC Chiro's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over five years seeking payments that GC Chiro was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully licensed, owned and controlled by non-physicians; (ii) it engaged in fee-splitting with non-physicians and paid kickbacks in exchange for patient referrals; (iii) the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; (iv) the billed-for services were performed by independent contractors, rather than by GC Chiro employees; and (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1."

367. GC Chiro's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Caruso and the Management Defendants operated GC Chiro, inasmuch as GC Chiro never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for GC Chiro to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through GC Chiro to the present day.

368. GC Chiro is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it is fraudulently licensed, owned and controlled by non-physicians, and unlawfully pays for patient referrals. GC Chiro likewise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by GC Chiro in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

369. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $610,000.00 pursuant to the fraudulent bills submitted by the Defendants through GC Chiro.

370. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
**Against Caruso and Kogan**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

371.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above.

372.     GC Chiro is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

373.     Caruso, Kogan, and John Doe Defendants 1-5 are employed by and/or associated with GC Chiro.

374.     Caruso, Kogan, and John Doe Defendants 1-5  knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the GC Chiro's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over five years seeking payments that GC Chiro was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully licensed, owned and controlled by non-physicians; (ii) it engaged in fee-splitting with non-physicians and paid kickbacks in exchange for patient referrals; (iii) the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; (iv) the billed-for services were performed by independent contractors, rather than by GC Chiro employees; and (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

375.     Caruso, Kogan, and John Doe Defendants 1-5 knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

376.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $610,000.00 pursuant to the fraudulent bills submitted by the Defendants through the GC Chiro.

377.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## FOURTH CAUSE OF ACTION
### Against GC Chiro, Caruso, and Kogan
### (Common Law Fraud)

378.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above.

379.     GC Chiro, Caruso, Kogan, and John Doe Defendants 1-5 intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

380.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that GC Chiro was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently licensed and actually owned and controlled by non-physicians; (ii) in every claim, the representation that GC Chiro was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law §

5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact GC Chiro was not properly licensed in that it engaged in illegal fee-splitting with non-physicians and paid illegal kickbacks for patient referrals; (iii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and in many cases were not performed at all; (iv) in every claim for services not actually performed by Smith, the representation that the billed-for services were performed by GC Chiro's employees, when in fact the billed-for services were performed – to the extent that they were performed at all – by independent contractors.

381.   GC Chiro, Caruso, Kogan, and John Doe Defendants 1-5 intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through GC Chiro that were not compensable under the No-Fault Laws.

382.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $610,000.00 pursuant to the fraudulent bills submitted by the Defendants through GC Chiro.

383.   The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

384.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**FIFTH CAUSE OF ACTION**
**Against GC Chiro, Caruso, and Kogan**
**(Unjust Enrichment)**

385.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above.

386.    As set forth above, GC Chiro, Caruso, Kogan, and John Doe Defendants 1-5 have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

387.    When GEICO paid the bills and charges submitted by or on behalf of GC Chiro for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

388.    GC Chiro, Caruso, Kogan, and John Doe Defendants 1-5 have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

389.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

390.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $610,718.93.

**SIXTH CAUSE OF ACTION**
**Against Caruso and Kogan**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

391.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above.

392.    Integrated Chiro is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

393.    Caruso, Kogan, and John Doe Defendants 1-5 knowingly conducted and/or participated, directly or indirectly, in the conduct of the Integrated Chiro's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute,

18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over three years seeking payments that Integrated Chiro was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully licensed, owned and controlled by non-physicians; (ii) it engaged in fee-splitting with non-physicians and paid kickbacks in exchange for patient referrals; (iii) the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; (iv) the billed-for services were performed by independent contractors, rather than by Integrated Chiro employees; and (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2."

394.    Integrated Chiro's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Caruso and the Management Defendants operated Integrated Chiro, inasmuch as Integrated Chiro never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Integrated Chiro to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Integrated Chiro to the present day.

395.    Integrated Chiro is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it is fraudulently licensed, owned and controlled by non-physicians, and unlawfully pays for patient referrals. Integrated Chiro likewise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Integrated Chiro in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

396.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $191,000.00 pursuant to the fraudulent bills submitted by the Defendants through Integrated Chiro.

397.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### SEVENTH CAUSE OF ACTION
**Against Caruso and Kogan**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

398.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above.

399.    Integrated Chiro is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

400.    Caruso, Kogan, and John Doe Defendants 1-5 are employed by and/or associated with Integrated Chiro.

401.    Caruso, Kogan, and John Doe Defendants 1-5  knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Integrated

Chiro's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over three years seeking payments that Integrated Chiro was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully licensed, owned and controlled by non-physicians; (ii) it engaged in fee-splitting with non-physicians and paid kickbacks in exchange for patient referrals; (iii) the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; (iv) the billed-for services were performed by independent contractors, rather than by Integrated Chiro employees; and (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2". Each such mailing was made in furtherance of the mail fraud scheme.

402.    Caruso, Kogan, and John Doe Defendants 1-5 knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

403.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $191,000.00 pursuant to the fraudulent bills submitted by the Defendants through the Integrated Chiro.

404.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## EIGHTH CAUSE OF ACTION
### Against Integrated Chiro, Caruso, and Kogan
### (Common Law Fraud)

405.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above.

406.    Integrated Chiro, Caruso, Kogan, and John Doe Defendants 1-5 intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

407.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Integrated Chiro was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently licensed and actually owned and controlled by non-physicians; (ii) in every claim, the representation that Integrated Chiro was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact Integrated Chiro was not properly licensed in that it engaged in illegal fee-splitting with non-physicians and paid illegal kickbacks for patient referrals; (iii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and in many cases were not performed at all; (iv) in every claim for services not

actually performed by Smith, the representation that the billed-for services were performed by Integrated Chiro's employees, when in fact the billed-for services were performed – to the extent that they were performed at all – by independent contractors.

408.    Integrated Chiro, Caruso, Kogan, and John Doe Defendants 1-5 intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Integrated Chiro that were not compensable under the No-Fault Laws.

409.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $191,000.00 pursuant to the fraudulent bills submitted by the Defendants through Integrated Chiro.

410.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

411.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## NINTH CAUSE OF ACTION
### Against Integrated Chiro, Caruso, and Kogan
### (Unjust Enrichment)

412.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above.

413.    As set forth above, Integrated Chiro, Caruso, Kogan, and John Doe Defendants 1-5 have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

414.    When GEICO paid the bills and charges submitted by or on behalf of Integrated Chiro for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

415.    Integrated Chiro, Caruso, Kogan, and John Doe Defendants 1-5 have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

416.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

417.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $191,485.54.

**TENTH CAUSE OF ACTION**
**Against Caruso and Kogan**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

418.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above.

419.    Full Spine Chiro is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

420.    Caruso, Kogan, and John Doe Defendants 1-5 knowingly conducted and/or participated, directly or indirectly, in the conduct of the Full Spine Chiro's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over five years seeking payments that Full Spine Chiro was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully licensed, owned and controlled by non-physicians; (ii) it engaged in fee-

splitting with non-physicians and paid kickbacks in exchange for patient referrals; (iii) the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; (iv) the billed-for services were performed by independent contractors, rather than by Full Spine Chiro employees; and (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3."

421.    Full Spine Chiro's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Caruso and the Management Defendants operated Full Spine Chiro, inasmuch as Full Spine Chiro never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Full Spine Chiro to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Full Spine Chiro to the present day.

422.    Full Spine Chiro is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it is fraudulently licensed, owned and controlled by non-physicians, and unlawfully pays for patient referrals. Full Spine Chiro likewise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing

submitted to GEICO and other insurers. These inherently unlawful acts are taken by Full Spine

Chiro in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and

other insurers through fraudulent no-fault billing.

423.    GEICO has been injured in its business and property by reason of the above-

described conduct in that it has paid at least $221,000.00 pursuant to the fraudulent bills

submitted by the Defendants through Full Spine Chiro.

424.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable

attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and

proper.

**ELEVENTH CAUSE OF ACTION**
**Against Caruso and Kogan**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

425.    GEICO incorporates, as though fully set forth herein, each and every allegation in

the paragraphs above.

426.    Full Spine Chiro is an ongoing "enterprise", as that term is defined in 18 U.S.C. §

1961(4), that engaged in activities which affected interstate commerce.

427.    Caruso, Kogan, and John Doe Defendants 1-5 are employed by and/or associated

with Full Spine Chiro.

428.    Caruso, Kogan, and John Doe Defendants 1-5  knowingly have agreed, combined

and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Full Spine

Chiro's affairs through a pattern of racketeering activity consisting of repeated violations of the

federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to

submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over

five years seeking payments that Full Spine Chiro was not eligible to receive under the No-Fault

Laws because: (i) it was unlawfully licensed, owned and controlled by non-physicians; (ii) it engaged in fee-splitting with non-physicians and paid kickbacks in exchange for patient referrals; (iii) the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; (iv) the billed-for services were performed by independent contractors, rather than by Full Spine Chiro employees; and (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3". Each such mailing was made in furtherance of the mail fraud scheme.

429.    Caruso, Kogan, and John Doe Defendants 1-5 knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

430.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $221,000.00 pursuant to the fraudulent bills submitted by the Defendants through the Full Spine Chiro.

431.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## TWELFTH CAUSE OF ACTION
### Against Full Spine Chiro, Caruso, and Kogan
### (Common Law Fraud)

432.    GEICO incorporates, as though fully set forth herein, each and every allegation in

the paragraphs above.

433.    Full Spine Chiro, Caruso, Kogan, and John Doe Defendants 1-5 intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

434.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Full Spine Chiro was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently licensed and actually owned and controlled by non-physicians; (ii) in every claim, the representation that Full Spine Chiro was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact Full Spine Chiro was not properly licensed in that it engaged in illegal fee-splitting with non-physicians and paid illegal kickbacks for patient referrals; (iii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and in many cases were not performed at all; (iv) in every claim for services not actually performed by Smith, the representation that the billed-for services were performed by Full Spine Chiro's employees, when in fact the billed-for services were performed – to the extent that they were performed at all – by independent contractors.

435.    Full Spine Chiro, Caruso, Kogan, and John Doe Defendants 1-5 intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated

effort to induce GEICO to pay charges submitted through Full Spine Chiro that were not compensable under the No-Fault Laws.

436.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $221,000.00 pursuant to the fraudulent bills submitted by the Defendants through Full Spine Chiro.

437.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

438.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## THIRTEENTH CAUSE OF ACTION
### Against Full Spine Chiro, Caruso, and Kogan
### (Unjust Enrichment)

439.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above.

440.    As set forth above, Full Spine Chiro, Caruso, Kogan, and John Doe Defendants 1-5 have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

441.    When GEICO paid the bills and charges submitted by or on behalf of Full Spine Chiro for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

442.    Full Spine Chiro, Caruso, Kogan, and John Doe Defendants 1-5 have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

443.     Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

444.     By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $221,210.94.

## FOURTEENTH CAUSE OF ACTION
### Against Caruso and Kogan
### (Violation of RICO, 18 U.S.C. § 1962(c))

445.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above.

446.     Brook Chiro is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

447.     Caruso, Kogan, and John Doe Defendants 1-5 knowingly conducted and/or participated, directly or indirectly, in the conduct of the Brook Chiro's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over three years seeking payments that Brook Chiro was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully licensed, owned and controlled by non-physicians; (ii) it engaged in fee-splitting with non-physicians and paid kickbacks in exchange for patient referrals; (iii) the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; (iv) the billed-for services were performed by independent contractors, rather than by Brook Chiro employees; and (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be

submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4."

448.    Brook Chiro's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Caruso and the Management Defendants operated Brook Chiro, inasmuch as Brook Chiro never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Brook Chiro to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Brook Chiro to the present day.

449.    Brook Chiro is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it is fraudulently licensed, owned and controlled by non-physicians, and unlawfully pays for patient referrals. Brook Chiro likewise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Brook Chiro in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

450.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $373,000.00 pursuant to the fraudulent bills submitted by the Defendants through Brook Chiro.

451.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### FIFTEENTH CAUSE OF ACTION
**Against Caruso and Kogan**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

452.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above.

453.    Brook Chiro is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

454.    Caruso, Kogan, and John Doe Defendants 1-5 are employed by and/or associated with Brook Chiro.

455.    Caruso, Kogan, and John Doe Defendants 1-5  knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Brook Chiro's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over three years seeking payments that Brook Chiro was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully licensed, owned and controlled by non-physicians; (ii) it engaged in fee-splitting with non-physicians and paid kickbacks in exchange for patient referrals; (iii) the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; (iv) the billed-for services were performed by independent contractors, rather than by Brook Chiro employees; and (v) the billing codes used for the services

misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4". Each such mailing was made in furtherance of the mail fraud scheme.

456.    Caruso, Kogan, and John Doe Defendants 1-5 knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

457.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $373,000.00 pursuant to the fraudulent bills submitted by the Defendants through the Brook Chiro.

458.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**SIXTEENTH CAUSE OF ACTION**
**Against Brook Chiro, Caruso, and Kogan**
**(Common Law Fraud)**

459.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above.

460.    Brook Chiro, Caruso, Kogan, and John Doe Defendants 1-5 intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

461.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Brook Chiro was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently licensed and actually owned and controlled by non-physicians; (ii) in every claim, the representation that Brook Chiro was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact Brook Chiro was not properly licensed in that it engaged in illegal fee-splitting with non-physicians and paid illegal kickbacks for patient referrals; (iii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and in many cases were not performed at all; (iv) in every claim for services not actually performed by Smith, the representation that the billed-for services were performed by Brook Chiro's employees, when in fact the billed-for services were performed – to the extent that they were performed at all – by independent contractors.

462.   Brook Chiro, Caruso, Kogan, and John Doe Defendants 1-5 intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Brook Chiro that were not compensable under the No-Fault Laws.

463.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $373,000.00 pursuant to the fraudulent bills submitted by the Defendants through Brook Chiro.

464.     The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

465.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## SEVENTEENTH CAUSE OF ACTION
### Against Brook Chiro, Caruso, and Kogan
### (Unjust Enrichment)

466.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs above.

467.     As set forth above, Brook Chiro, Caruso, Kogan, and John Doe Defendants 1-5 have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

468.     When GEICO paid the bills and charges submitted by or on behalf of Brook Chiro for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

469.     Brook Chiro, Caruso, Kogan, and John Doe Defendants 1-5 have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

470.     Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

471.     By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $373,517.71.

## EIGHTEENTH CAUSE OF ACTION
### Against Caruso and Kogan
### (Violation of RICO, 18 U.S.C. § 1962(c))

472.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above.

473.    Compass Chiro is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

474.    Caruso, Kogan, and John Doe Defendants 1-5 knowingly conducted and/or participated, directly or indirectly, in the conduct of the Compass Chiro's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over a year seeking payments that Compass Chiro was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully licensed, owned and controlled by non-physicians; (ii) it engaged in fee-splitting with non-physicians and paid kickbacks in exchange for patient referrals; (iii) the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; (iv) the billed-for services were performed by independent contractors, rather than by Compass Chiro employees; and (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "5."

475.    Compass Chiro's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Caruso and the Management Defendants operated Compass Chiro, inasmuch as Compass Chiro never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Compass Chiro to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Compass Chiro to the present day.

476.    Compass Chiro is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it is fraudulently licensed, owned and controlled by non-physicians, and unlawfully pays for patient referrals. Compass Chiro likewise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Compass Chiro in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

477.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $69,000.00 pursuant to the fraudulent bills submitted by the Defendants through Compass Chiro.

478.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**NINETEENTH CAUSE OF ACTION**
**Against Caruso and Kogan**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

479.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above.

480.    Compass Chiro is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

481.    Caruso, Kogan, and John Doe Defendants 1-5 are employed by and/or associated with Compass Chiro.

482.    Caruso, Kogan, and John Doe Defendants 1-5  knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Compass Chiro's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over a year seeking payments that Compass Chiro was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully licensed, owned and controlled by non-physicians; (ii) it engaged in fee-splitting with non-physicians and paid kickbacks in exchange for patient referrals; (iii) the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; (iv) the billed-for services were performed by independent contractors, rather than by Compass Chiro employees; and (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified

through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "5". Each such mailing was made in furtherance of the mail fraud scheme.

483.    Caruso, Kogan, and John Doe Defendants 1-5 knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

484.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $61,000.00 pursuant to the fraudulent bills submitted by the Defendants through the Compass Chiro.

485.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### TWENTIETH CAUSE OF ACTION
**Against Compass Chiro, Caruso, and Kogan**
**(Common Law Fraud)**

486.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above.

487.    Compass Chiro, Caruso, Kogan, and John Doe Defendants 1-5 intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

488.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Compass Chiro was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently licensed and actually

owned and controlled by non-physicians; (ii) in every claim, the representation that Compass Chiro was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact Compass Chiro was not properly licensed in that it engaged in illegal fee-splitting with non-physicians and paid illegal kickbacks for patient referrals; (iii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and in many cases were not performed at all; (iv) in every claim for services not actually performed by Smith, the representation that the billed-for services were performed by Compass Chiro's employees, when in fact the billed-for services were performed – to the extent that they were performed at all – by independent contractors.

489.     Compass Chiro, Caruso, Kogan, and John Doe Defendants 1-5 intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Compass Chiro that were not compensable under the No-Fault Laws.

490.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $69,000.00 pursuant to the fraudulent bills submitted by the Defendants through Compass Chiro.

491.     The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

492.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## TWENTY-FIRST CAUSE OF ACTION
### Against Compass Chiro, Caruso, and Kogan
### (Unjust Enrichment)

493.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs above.

494.    As set forth above, Compass Chiro, Caruso, Kogan, and John Doe Defendants 1-5 have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

495.    When GEICO paid the bills and charges submitted by or on behalf of Compass Chiro for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

496.    Compass Chiro, Caruso, Kogan, and John Doe Defendants 1-5 have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

497.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

498.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $69,700.69.

## JURY DEMAND

499.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company demand that a Judgment be entered in their favor:

A.     On the First Cause of Action against the PC Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that the PC Defendants have no right to receive payment for any pending bills submitted to GEICO;

B.     On the Second Cause of Action against Caruso and Kogan, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $610,718.93, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.     On the Third Cause of Action against Caruso and Kogan, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $610,718.93, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.     On the Fourth Cause of Action against GC Chiro, Caruso, and Kogan, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $610,718.93, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

E.     On the Fifth Cause of Action against GC Chiro, Caruso, and Kogan, more than $610,718.93 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

F.     On the Sixth Cause of Action against Caruso and Kogan, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $191,485.54, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

G.      On the Seventh Cause of Action against Caruso and Kogan, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $191,485.54, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

H.      On the Eighth Cause of Action against Integrated Chiro, Caruso, and Kogan, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $191,485.54, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

I.       On the Ninth Cause of Action against Integrated Chiro, Caruso, and Kogan, more than $191,485.54 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

J.       On the Tenth Cause of Action against Caruso and Kogan, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $221,210.94, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

K.      On the Eleventh Cause of Action against Caruso and Kogan, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $221,210.94, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

L.      On the Twelfth Cause of Action against Full Spine Chiro, Caruso, and Kogan, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $221,210.94, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

M.      On the Thirteenth Cause of Action against Full Spine Chiro, Caruso, and Kogan, more than $221,210.94 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

N.      On the Fourteenth Cause of Action against Caruso and Kogan, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $373,517.71, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

O.      On the Fifteenth Cause of Action against Caruso and Kogan, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $373,517.71, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

P.      On the Sixteenth Cause of Action against Brook Chiro, Caruso, and Kogan, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $373,517.71, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

Q.      On the Seventeenth Cause of Action against Brook Chiro, Caruso, and Kogan, more than $373,517.71 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

R.      On the Eighteenth Cause of Action against Caruso and Kogan, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $69,700.69, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

S.      On the Nineteenth Cause of Action against Caruso and Kogan, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $69,700.69, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

T.      On the Twentieth Cause of Action against Compass Chiro, Caruso, and Kogan, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $69,700.69, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

U.      On the Twenty-First Cause of Action against Compass Chiro, Caruso, and Kogan, more than $69,700.69 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

Dated:  Uniondale, New York
        June 5, 2020

                                    RIVKIN RADLER LLP

                                    By: ___/s/ *Joshua D. Smith, Esq.*___
                                        Michael A. Sirignano (MS 5263)
                                        Barry I. Levy (BL 2190)
                                        Joshua D. Smith (JS 3989)
                                    926 RXR Plaza
                                    Uniondale, New York 11556
                                    (516) 357-3000

                                    *Counsel for Plaintiffs, Government Employees*
                                    *Insurance Company, GEICO Indemnity Company,*
                                    *GEICO General Insurance Company and GEICO*
                                    *Casualty Company*